Charles B. COX, Appellant,

v.

Vicki M. COX, Appellee.

No. S–5449.

Supreme Court of Alaska.

Sept. 9, 1994.

Donna C. Willard, Law Offices of Donna C. Willard, Anchorage, for appellant.

R. Scott Taylor, Rice, Volland and Gleason, P.C., Anchorage, for appellee.

Before MOORE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and BRYNER, J., Pro Tem.*

*OPINION*

MOORE, Chief Justice.

## I. INTRODUCTION

Appellant Charles B. Cox (C.B.) appeals from a final decision of the superior court distributing marital property in the course of divorce proceedings between C.B. and Vicki M. Cox (Vicki). Findings of Fact and Conclusions of Law were issued September 15, 1992. The final decree was signed October 23, 1992.

C.B. raises 22 points on appeal. He essentially makes two broad arguments. First, he asserts that the trial court should have used a different method of distributing the marital property. Second, he finds fault with the court's actual distribution of the property under its chosen method. He claims that the court erred in identifying marital versus separate property, in valuing the assets, and in equitably dividing them for distribution.

## II. FACTS AND PROCEEDINGS

C.B. and Vicki Cox were married on February 23, 1985. Six and one-half years later, on August 9, 1991, they permanently separated. No children were born of this marriage, although Vicki has custody of two daughters from her previous marriage. Their divorce went to trial in September 1992, with property division the only issue.

At the time of their marriage, each party was employed and had a separate residence.

C.B. was a computer programmer/analyst for the State of Alaska and owned a house on Pokey Circle in Anchorage. Vicki was a partner in a business called The Floor Store and owned a house on Northern Lights Boulevard in Anchorage. At the time of the marriage, C.B.'s net worth was $141,502. This figure takes into account the mortgage balance of $33,679 on the Pokey Circle property—the only debt owed by C.B. at that time.

Vicki's financial situation was much worse. Her only asset was a heavily mortgaged home, with minimal equity. Vicki had substantial debts from The Floor Store, the business in which she and her previous husband had been partners and which she continued to operate after her first divorce. The Floor Store obligation had resulted in a second mortgage on the Northern Lights home. In addition, Vicki was responsible for payment to The Floor Store of $20,829, which she and her prior husband had taken in draws. She met this obligation by working at The Floor Store during the first year of her marriage to C.B. and having the bulk of her compensation credited against the debt. As a result, in 1985, she brought home only $12,600 from her full time employment, while C.B. had to pay the couple's taxes on the additional $20,829 debt that Vicki worked off, for which an IRS Form 1099 was issued. The Floor Store business eventually failed, resulting in Vicki filing personal bankruptcy in order to discharge responsibility for the debts which she had guaranteed. When the business closed, Vicki became personally liable on a debt of $19,000 to the Internal Revenue Service.

Because of Vicki's financial circumstances, C.B. was required to make the payments on all of the real property, separate or marital. Substantial sums garnered from his premarital assets were used in this endeavor. C.B. identified $19,355 of premarital assets immediately dedicated to the marriage.

Since Vicki's Northern Lights house was larger than C.B.'s, he moved into that residence upon marriage and rented the Pokey Circle house. One year later, when the Mu-

* Sitting by assignment made pursuant to article IV, section 16 of the Alaska Constitution.

nicipality of Anchorage condemned the Northern Lights residence, the couple purchased a larger home on Kingfisher Drive. While Vicki maintains, and the trial court found in Finding No. 7,[1] that this house was purchased with funds from both premarital residences, the refinancing of C.B.'s Pokey Circle property furnished the bulk of the funds. C.B. was able to refinance the Pokey Circle property for $66,850, of which he received $31,925.57 after paying the original mortgage and the refinancing costs. With these proceeds, $17,000 was used by C.B. as a down payment on the Kingfisher home, $7,000 was invested in a real estate partnership, $3,500 was used to purchase an airboat and $4,000 was placed in Individual Retirement Accounts, one for C.B. and one for Vicki.

In contrast, Vicki had very little equity in her premarital home. Of the $145,320 in condemnation proceeds, after deducting the balances of her first and second mortgage and the costs and fees incurred in the condemnation litigation, Vicki received only $2,600. C.B. argues that this sum should be characterized as child support, rather than Vicki's separate property, since Vicki had taken equity in the residence in lieu of four years of child support from her former husband.

Shortly after their separation, Vicki settled, for $14,603, two personal injury causes of action which accrued during marriage, without consultation with her husband and without considering any of his potential claims. Vicki used these funds to purchase a new house while the divorce was pending. Despite Vicki's $3,000 monthly salary, $600 monthly child support, the personal injury settlement and access to her children's accounts (discussed *infra* at § III.C.4), C.B. bore nearly sole responsibility for all of the marital debts between separation and trial. Thus, from August 9, 1991 to July 31, 1992 he paid, from his post-separation earnings, a total of $27,235 for the Kingfisher residence, the Deshka River recreational property that the couple had acquired, airboat repairs and marital accounts payable. Vicki only assisted during the month of August 1992, when

she paid that month's obligations from a $4,666 income tax refund that the couple had received. In order to keep the couple's credit in good standing and to timely pay all of their obligations, C.B. borrowed $10,000 from Alaska Employees Federal Credit Union and cashed in annual leave.

The trial court valued the net assets of the marriage at over $227,000, including C.B.'s retirement benefits and deferred compensation account totalling $154,378. See Findings No. 8 & 9 in Addendum. The trial court awarded Vicki assets with a total net value of $113,023.50, and awarded C.B. assets totalling $114,588.50. See Finding No. 13 in Addendum. The only debt attached to Vicki's assets was $12,450 on the Deshka property, on which monthly payments of $250 are due. On the other hand, imbedded in C.B.'s award were the following debts: $137,200 on the Kingfisher mortgage; $10,000 on the loan to pay post-separation expenses; and $62,047 on the Pokey Circle mortgage.

### III. DISCUSSION

#### A. Standard of Review

■ The trial court has broad discretion in fashioning a property division in a divorce action. AS 25.24.160(a)(4); *Hartland v. Hartland*, 777 P.2d 636, 639 (Alaska 1989). This court reviews the trial court's determination of what property is available for distribution under an abuse of discretion standard. *Jones v. Jones*, 835 P.2d 1173, 1175 (Alaska 1992). If in the course of determining what property is available the trial court makes any legal determinations, such determinations are reviewable under the "independent judgment" standard. *Lewis v. Lewis*, 785 P.2d 550, 552 (Alaska 1990). All questions of law are reviewed *de novo* with this court adopting the rule of law that is most persuasive in light of precedent, reason and policy. *Lantz v. Lantz*, 845 P.2d 429, 431 n. 1 (Alaska 1993). However, the trial court's findings that the parties intended to treat property as marital are disturbed only if clearly erroneous. *Matson v. Lewis*, 755 P.2d 1126, 1128 (Alaska 1988). The valuation of available property is a factual determination that

---

1. See the attached Addendum for a complete list of the trial court's Findings.

should be reversed only if clearly erroneous. *McDaniel v. McDaniel,* 829 P.2d 303, 305 (Alaska 1992). The equitable allocation of property is reviewable under an abuse of discretion standard and will not be reversed "unless it is clearly unjust." *Doyle v. Doyle,* 815 P.2d 366, 368 (Alaska 1991) (citation omitted).

### B. *Method of Property Distribution*
#### 1. *Wanberg Method*

■ A three-step process is used in Alaska to divide marital assets. *See, e.g., Jones,* 835 P.2d at 1175. First, the court determines what specific property is available for distribution. *Wanberg v. Wanberg,* 664 P.2d 568, 570 (Alaska 1983). Second, the court values that property. *Id.* Finally, the court equitably allocates it. *Id.* The trial court used this method of distribution in this case.

#### 2. *Rose Method*

■ This court has used an alternative approach for marriages of short duration where there has been no significant commingling of assets. *Rose v. Rose,* 755 P.2d 1121, 1125 (Alaska 1988). C.B. proposes that this rescission approach should have been used in the present case. The trial court in this case specifically found that "this marriage ... is one in which the commingling of assets was general." See Finding No. 6 in Addendum.

The Coxes had a joint checking account. Before Vicki's debt to the IRS arose, she deposited her paycheck into that checking account. After they became aware of her debt to the IRS, she removed her name from the joint checking account and deposited her paychecks into a separate account from which the IRS would be paid (the "IRS account"). However, she continued to trans-

fer money as needed to the checking account in C.B.'s name, from which marital expenses were paid. She also paid for food for the family out of the IRS account. In addition to his paycheck, C.B. also transferred the rental income from the Pokey Circle house into the family checking account. Thus, there is sufficient evidence in the record of commingling so that the trial court's finding regarding this aspect of the parties' management of their property was not clearly erroneous, and therefore C.B.'s argument that the *Rose* method is appropriate must fail.

#### 3. *"Source of the Funds" Method*

■ Alternatively, C.B. proposes that a third approach to property division should have been used in this case. He argues that this court should adopt the "source of the funds" rule. Without fully defining this rule, he describes it as providing that "the measure of compensation to each party is the base amount of the marital contribution along with any appreciation or depreciation, so that both parties receive a fair and proportionate return on their investment." [2] As C.B. points out, in *Zimin v. Zimin,* 837 P.2d 118 (Alaska 1992), this court affirmed the trial court's use of the source of funds approach: "Although we do not adopt the source of funds rule *per se,* it is not inconsistent with our statutes and caselaw." *Id.* at 122 n. 6.

However, the circumstances under which the rule was applied in *Zimin* differ from the instant case. In *Zimin,* the trial court was essentially forced into a source of funds approach because there was no evidence regarding the present value of the disputed property. *Id.* at 122. Therefore, the court valued the marital portion of the various assets based on the debt payments made during the marriage. *Id.* The trial court

---

**2.** A leading treatise on equitable distribution defines this rule as follows:

> [T]he source of funds rule is a combination of the mixed theory of property and a payment-based definition of acquisition. The net effect of this combination is that property is classified according to the classification of the funds used to purchase it: property purchased with marital property is marital, while property purchased with separate property remains separate. Where property is purchased with mixed funds, the ratio between the marital and the separate interests is the same as the ratio between the marital and separate contributions. Moreover, property purchased on debt is classified according to the funds used to pay off the debt and to the extent the debt remains unpaid, the property has not yet been acquired.

Brett R. Turner, *Supplement* to Lawrence J. Golden, *Equitable Distribution of Property* § 5.07A, at 81 (1993).

recognized that this method failed to take into account the post-marital appreciation or depreciation of the property. *Id.* Our holding was thus limited to the approval of the source of funds approach in the limited context of determining current value in the absence of any other evidence. *Id.* n. 6. We recognized that the trial court could have reached the same result under our rules of equitable division and therefore it did not abuse its discretion under the circumstances. *Id.*

To require the use of the source of funds rule in this case would be an expansion of the *Zimin* holding. It is one thing to hold that use of the source of funds rule in limited circumstances is not an abuse of discretion; it would be quite a leap from *Zimin* to hold that it must be applied in a given set of circumstances as a matter of law. We are not satisfied that such a leap would be appropriate. Therefore, we decline to depart from the *Wanberg* method of property distribution.

## C. *Identification of Marital Property*

■ C.B. maintains that the trial court's factual findings reveal a failure to adequately distinguish between marital and separate property. The only reference to the issue appears in Finding No. 7, which states that "[t]he equity value of the premarital residences of the parties were combined to purchase the marital residence." See Addendum. This Finding is deficient in several respects. First, Vicki did not contribute any equity from her premarital home to the purchase of the Kingfisher house. Second, the Finding implies that all of the equity from C.B.'s premarital home went to purchase the new marital home. It simply fails to classify the property purchased with the rest of the funds from the refinancing of the Pokey Circle property. Third, it fails to address other property which C.B. argues should be classi-

3. In reaching this conclusion we are not implying that the Kingfisher house was not itself marital property. *See Chotiner v. Chotiner,* 829 P.2d 829, 833 (Alaska 1992).

4. C.B. bases this argument in part on his contribution of at least an additional $19,355 in fungible premarital assets to support Vicki's children and to make payments on her premarital resi-

fied as his separate property. A remand for further findings is therefore warranted pursuant to *Murray v. Murray,* 788 P.2d 41, 42 (Alaska 1990), where we stated that "the superior court's failure to distinguish separate from marital property, or to enter any finding as to the necessity of [the] invasion [of one spouse's separate premarital property], is reversible error."[3]

### 1. *Equity of Premarital Residences*

The only evidence in the record indicates that Vicki's net proceeds from the condemnation of the Northern Lights home did not exceed $2,600, and that this money was used for general purposes. Thus, contrary to Finding No. 7, Vicki did not contribute these funds to purchase the marital residence.

■ With respect to the proceeds of the Pokey Circle refinancing, C.B. argues that the property purchased with these funds should be treated as separate property. Of the $32,000 in proceeds, $17,000 was used for the Kingfisher downpayment. Nevertheless, C.B. argues that the equities in this case dictate classifying this portion of the proceeds as separate property.[4]

■ In *Miles v. Miles,* 816 P.2d 129 (Alaska 1991), we stated that

[i]t is within the trial court's discretion to find that premarital assets have become part of the marital estate. However, we have held that the act of commingling assets "does not automatically establish intent to jointly hold property, and a court always should consider the property's source when determining what assets are available for distribution." *Carlson v. Carlson,* 722 P.2d 222, 224 (Alaska 1986). Thus, the trial court retains discretion to decide whether a premarital asset remains separate property even where the asset has been treated as joint property. The

dence as well as Kingfisher. C.B. alleges that it was an abuse of discretion not to recognize such substantial contributions of premarital property. While these are equitable considerations in C.B.'s favor which may be factored into the ultimate distribution, it was not an abuse of discretion to ignore them at the property classification stage.

trial court makes this determination in the context of an equitable division of marital assets and its balancing of the parties' situation under the *Merrill* factors.

*Id.* at 132 (footnote omitted). While *Miles* makes it clear that it is not an abuse of discretion to treat a premarital asset as separate property under these circumstances, it does not state that it would be an abuse of discretion *not* to treat the premarital asset as separate property. To treat C.B.'s contribution of premarital assets as marital property would not ordinarily be an abuse of discretion if there is evidence that C.B. intended the transmutation of separate property into marital property and there are acts which demonstrate that intent. *See Chotiner v. Chotiner,* 829 P.2d 829, 832–33 (Alaska 1992). However, given the inaccuracies and the lack of detail in the trial court's lone Finding on this subject, a remand is in order in this case.

The trial court's Finding was also erroneous in the respect that only $17,000 of the $32,000 Pokey Circle refinancing proceeds were used for the down payment on the couple's Kingfisher home. The remaining proceeds were used to purchase the airboat, the real estate partnership investment, and IRA accounts for both C.B. and Vicki. Both parties agree that placing separate property in joint ownership is rebuttable evidence that the owner intended the property to be marital. *See, e.g., Chotiner,* 829 P.2d at 833. C.B. argues that no presumption exists in this case regarding those assets which were never in Vicki's name: C.B.'s IRA account, the airboat, and the Parker Parsley real estate partnership investment. C.B. argues that there was no other evidence suggesting that these assets were converted to marital property, since no additions were made to them from marital funds. Vicki offers no argument why they should be treated as marital assets, other than her reliance on the trial court's erroneous Finding No. 7. Because this Finding does not address the classification of those assets, other than the Kingfisher home, which were purchased using the equity value of C.B.'s premarital residence, we remand for classification of these assets.

### 2. *The Pokey Circle Property*

▮▮▮▮ C.B. contends that the trial court, without any explanation, designated the Pokey Circle property as marital in nature. Separate property becomes marital only upon a showing that the parties intended to treat the property as marital. *Chotiner,* 829 P.2d at 832. The proper standards for determining whether real property should be characterized as marital are set forth in such cases as *Chotiner* and *McDaniel v. McDaniel,* 829 P.2d 303 (Alaska 1992). The relevant factors include: "(1) the use of property as the parties' personal residence, and (2) the ongoing maintenance and managing of the property by both parties," *McDaniel,* 829 P.2d at 306 (citing *Burgess v. Burgess,* 710 P.2d 417, 420 (Alaska 1985)), as well as (3) placing the title of the property in joint ownership and (4) using the credit of the non-titled owner to improve the property. *Chotiner,* 829 P.2d at 833. C.B. maintains that Vicki never lived in the Pokey Circle residence nor contributed to its maintenance and management, that rents were sufficient to cover all expenses, that there is no evidence of an intent to treat the property as marital, and that it therefore should have been treated as separate property.

▮▮▮▮ Vicki points to contrary evidence in the record. The loan documentation from the United States Department of Housing and Urban Development for the Pokey Circle refinancing shows that the property was titled in the names of both parties and both were "sellers," *jointly liable* on the loan. *See, e.g., Rhodes v. Rhodes,* 867 P.2d 802, 805 (Alaska 1994) (co-signing of loan and assumption of joint liability for its repayment are indicative of intent to treat property as marital). The rental income was deposited into the marital checking account, and all expenses associated with the property were paid from that account. While the rental income covered most of the expenses, for at least six to eight months during the marriage the property was vacant. Thus, Vicki maintains that she assumed a financial risk on the refinancing and that she contributed to mortgage and maintenance payments by depositing her income into the marital account from which these expenses were paid. Because

the trial court did not make any finding regarding the parties' intentions to treat Pokey Circle as marital property, we remand for further findings on this issue.

### 3. *Dean Witter Account*

Aside from those assets purchased from the Pokey Circle refinancing proceeds, and the Pokey Circle home itself, the only other asset which C.B. identifies as being misclassified as marital is his Dean Witter commodities trading account. As with some of the assets purchased from the Pokey Circle refinancing proceeds, this account is personal property which never bore Vicki's name. However, there was evidence that C.B. invested money into the account during the course of the marriage. Based on the evidence in the record, it may not have been an abuse of discretion to treat the account as marital property. However, since the trial court made no separate finding that classified this account as marital property, we remand for further findings.

### 4. *Girls' Checking Accounts*

As stated above, Vicki took the equity in her premarital residence in lieu of four years of child support from her previous husband. When Vicki's prior husband was once again required to make child support payments, C.B. suggested that one-half of each monthly payment of $300 per child be placed into an account to be accumulated for the girls' higher education. Thereafter, whenever possible, $150 a month was placed into an account for each of the girls, leaving only $300 each month for child support expenses, even though it was costing $1,000 to $1,200 a month to support both children. The trial court found these accounts to be property of the children and not marital assets. See Finding No. 14 in Addendum.

C.B. alleges that the court erred in not treating these accounts as marital assets. He points out that the dedicated use of this money was not "sacrosanct." If funds were needed, it was used for household expenses, although C.B. kept track of it to ensure that it was replaced. If the family did not need it one month, the entire $600 would be placed in the accounts. However, if the budget did not balance, the child support was freely used for expenditures both big and small. Thus, C.B. contends that these savings accounts were to be used in the marriage.

However, as Vicki points out, these were dedicated accounts from which every withdrawal by the marriage was documented and eventually replaced. We hold that the record provides sufficient support so that the trial court's Finding that the accounts were not marital property was not an abuse of discretion and should thus be affirmed.

### D. *Valuation of Assets*

#### 1. *Valuation Date*

While the values of many of the assets were the subject of stipulations, some of the most important assets were not covered. The court chose August 1991, the date of *separation*, as the date for valuing these assets. See Finding No. 4 in Addendum. The court gave no reason for selecting this date. We have held that while the date for *classification* of property is that of separation, the proper date for *valuation* is one as close as practicable to that of trial. *Ogard v. Ogard*, 808 P.2d 815, 819 & n. 8 (Alaska 1991). While we recognized in *Ogard* that there may be special situations in which the date of separation is more appropriate, we held that the court must make specific findings in such cases as to why the use of this date is proper. *Id.* at 820; *see also McDaniel*, 829 P.2d at 307.

C.B. argues that the court erred in valuing the parties' checking accounts at the date of separation, since after the date of separation he used more than $4,000 of his money to retire immediate obligations of the marriage. The court valued his checking account at $2,555—the amount at the date of separation—and awarded this amount to Vicki. C.B. further argues that this "asset" should not have been included at all since it did not exist at the date of trial. Under *Chotiner*, 829 P.2d at 834, it is error to place a value on an account that has been emptied prior to trial. We therefore remand for valu-

ation of the checking account at the time of trial, rather than at the date of separation.[5]

### 2. *Valuation of Pokey Circle Property*

C.B. also alleges mistakes in the valuation of the Pokey Circle property. The only current market value entered into evidence was a 1992 tax assessment for $35,400. The only other valuation was a November 1985 appraisal for $95,500. Yet, the court valued the property at $62,500, despite the lack of any evidence in the record that this was the market value. See Finding No. 9 in Addendum. The debt on the Pokey Circle property at the date of separation was $62,046.73. The trial court assigned the property a $1.00 net value for distribution purposes. See Finding No. 13 in Addendum. C.B. alleges that the trial court should have instead used a negative value, offsetting the debt against $35,400. Given the lack of any support in the record for the trial court's valuation, we remand for further proceedings as to the market value of the Pokey Circle property.

### 3. *Valuation of the Kingfisher House*

C.B. argues that the court erred in two respects in its valuation of the Kingfisher house. First, while C.B. agrees that the market value at the date of trial was approximately $145,000 and the debt $137,200, he argues that the court also should have deducted selling costs. Thus, C.B.'s expert testified at trial that a sale at that time would have resulted in a loss of $6,827 when closing costs were considered. However, the expert admitted on cross-examination that this figure anticipated the seller paying all closing costs, and that it would change if the buyer shared the costs. Vicki proposed a negligible net value, and the court agreed, using the $145,000 and $137,200 values but assigning a nominal net value of $1. See Finding No. 13 in Addendum. The court thus effectively deducted approximately $7,800 for selling costs. The valuation of the property at $1

was not clearly erroneous, given the speculative nature of the testimony regarding values and sales costs, and the lack of a firm selling date.

C.B.'s second argument regarding the valuation of the Kingfisher property is that, to the extent the debt against the Pokey Circle property was directly caused by the refinancing to purchase the Kingfisher home, this debt should be deducted from the value of that home. C.B. does not provide any persuasive legal basis for this argument. As Vicki points out, the Pokey Circle mortgage is secured by the Pokey Circle property, not by the Kingfisher property. All of this mortgage should be deducted from the value of the Pokey Circle property, not from the Kingfisher home. Thus, we affirm the trial court's valuation.

### 4. *Personal Property*

The final valuation issue raised concerns personal property. C.B. presented evidence that Vicki removed $4,022 in marital personalty while he was left with items worth $1,055. The trial court placed no value whatsoever on the personal property, but simply stated that "[t]he combination of that division and that contained in [Finding No. 13] is an equitable division." See Finding No. 15 in Addendum. The trial court must make findings to give this court a means of evaluating whether an equitable distribution has been achieved. *Lang v. Lang*, 741 P.2d 1193, 1195 (Alaska 1987) (citing *Merrill v. Merrill*, 368 P.2d 546, 547–48 (Alaska 1962)). The court's failure to make any findings regarding the value of the personal property constitutes reversible error, and we therefore remand for such findings.

### E. *Equitable Distribution*

In making an equitable allocation of the marital property between the parties, the trial court must consider the *Merrill* factors,

---

**5.** If assets no longer exist or are not owned by the parties, they are not available for distribution. However, where there is evidence that a marital asset was dissipated, wasted, or converted to a non-marital form, the court can "recap-

ture" the asset by giving it an earlier valuation date and crediting all or part of it to the account of the party who controlled the asset. *See Gallant v. Gallant*, 882 P.2d 1252, 1255, n. 5 (Alaska

368 P.2d at 548 n. 4, as codified in AS 25.24.160(a)(4):

(A) the length of the marriage and station in life of the parties during the marriage;

(B) the age and health of the parties;

(C) the earning capacity of the parties, including their educational backgrounds, training, employment skills, work experiences, length of absence from the job market, and custodial responsibilities for children during the marriage;

(D) the financial condition of the parties, including the availability and cost of health insurance;

(E) the conduct of the parties, including whether there has been unreasonable depletion of marital assets;

(F) the desirability of awarding the family home, or the right to live in it for a reasonable period of time, to the party who has primary physical custody of children;

(G) the circumstances and necessities of each party;

(H) the time and manner of acquisition of the property in question; and

(I) the income-producing capacity of the property and the value of the property at the time of the division.

The *Merrill* factors are not exclusive in determining an equitable division; the trial court may consider other relevant factors. *Laing v. Laing*, 741 P.2d 649, 652 (Alaska 1987).

■ The trial court's Findings did not state which of the *Merrill* factors were considered. The only subjects mentioned were valuation and the six and one-half years duration of the marriage. See Finding No. 6 in Addendum. No apparent consideration was given to the fact that C.B. is eight years older than Vicki and is scheduled to retire in seven years. The time and manner of acquisition of the property was also not mentioned.[6]

*1. Preservation of the Marital Estate*

C.B. maintains that other factors should have been considered, including the substantial sums which he expended in order to preserve the marital estate. This court has "required that trial courts consider payments made to maintain marital property from post-separation income when dividing marital property." *Ramsey v. Ramsey*, 834 P.2d 807, 809 (Alaska 1992). "[T]he fact that one party has made payments from non-marital income to preserve marital property should be considered as one of the circumstances to be weighed by the trial court in dividing the marital property." *Id.* The court's Findings show no consideration of C.B.'s preservation of the marital estate from post-marital earnings. Furthermore, as discussed *supra*, by valuing the checking accounts at the date of separation, the court failed to consider that C.B. used his account to pay post-separation marital debts while Vicki used hers for her separate expenses.

■ This court has "consistently ... considered the conduct of the parties with respect to the marital property and debts after separation a relevant factor in determining a just division." *Oberhansly v. Oberhansly*, 798 P.2d 883, 885 (Alaska 1990). For example, in *Jones*, 835 P.2d at 1177, the husband argued that he should have been given credit for $6,889 in house payments made from his own funds after separation. We remanded to the trial court for further consideration of whether the property distribution should have been adjusted accordingly. Likewise, in *Oberhansly*, the court held that it was proper for the superior court to consider one party's fault in allowing most of the household debts to fall into default and in paying personal debts out of marital assets. *Oberhansly*, 798 P.2d at 885. In the present case, we remand for the trial court to determine whether C.B.'s payment of the marital debts from post-separation earnings and his personal checking account, as well as Vicki's

1994); *Jones*, 835 P.2d at 1175–76; *Hartland*, 777 P.2d at 642.

**6.** Vicki alleges that C.B. waived his right to seek an adjustment based on the *Merrill* factors, since he did not raise this argument before the trial court. C.B. counters that asking for application of the *Merrill* factors is implicit in asking the

court to make an *equitable* distribution. Waiver is not appropriate here, since application of the *Merrill* factors is closely related to C.B.'s trial court theory, and since C.B.'s reliance on them could have been gleaned from the pleadings. *See, e.g., Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985).

expenditure of marital assets for post-separation expenses, should cause a change in the property distribution.[7]

### 2. *Vicki's Premarital Debt*

Although the parties stipulated that the court could consider that marital assets were used to pay Vicki's premarital debt, Finding No. 12 held:

> The court gives little weight to this. The choice to use marital assets in payment of premarital debt under the circumstances of this case does not call for a substantial shift in the distribution of the marital estate upon divorce. The evidence does not reflect over-reaching or fraud between spouses on this issue and the decision to pay one's debts rather than to purchase additional things or savings does not automatically call for rebalancing the divorce equation.

C.B. argues that, in fact, the court gave no weight whatsoever to this factor and shifted no money. However, the fact that no credit was given does not mean that the trial court did not give the matter adequate consideration. The decision not to adjust the parties' accounts as a result of this factor is within the discretion of the trial court and is therefore not reversible error. *Cf. Ramsey*, 834 P.2d at 809 (court did not abuse its discretion by failing to give credit for payments from non-marital income to preserve marital property); *Chotiner*, 829 P.2d at 834–35 (court did not abuse its discretion by failing to give credit for separate property contribution of husband).

### 3. *C.B.'s Support of Vicki's Children*

C.B. also alleges that the trial court overlooked his support of Vicki's children from a prior marriage. Alaska case law has held that a trial court does not abuse its discretion in considering this factor. *See, e.g., Burcell v. Burcell*, 713 P.2d 802, 805 (Alaska 1986). No case directly addresses whether it is an abuse of discretion not to consider this factor. However, given the controversy in this case over the establish-

ment and character of Vicki's daughters' bank accounts, C.B.'s support is a relevant factor that the trial court should have considered in making an equitable distribution. Therefore we remand to the trial court for explicit consideration of this issue.

### 4. *Social Security Benefits*

C.B. also asks this court to declare, for the first time, that Social Security benefits may be taken into account in making an equitable distribution. We have held that the doctrine of federal preemption prevents state courts from dividing Social Security benefits. *Mann v. Mann*, 778 P.2d 590, 591 (Alaska 1989). C.B. does not dispute this holding; he proposes that the possibility of Vicki receiving Social Security benefits merely be taken into account in the distribution.

Unlike Alaska SBS benefits, to which an employee has a specific entitlement, Social Security benefits are not deferred compensation for services rendered but rather a governmental safety net for the retired. The employee has no contractual right to such benefits. *Id.* at 592. The sum of the Social Security taxes paid from an employee's earnings are not a measure of any potential Social Security benefits that the employee might receive upon retirement. Nevertheless, C.B. cites to cases from three different states which have held that Social Security benefits are but one factor to be considered in the disposition of the marital property, and that there is no federal prohibition excluding their consideration in the divorce context. *See, e.g., In re Marriage of Knipp*, 15 Kan.App.2d 494, 809 P.2d 562, 564 (1991); *Elliott v. Elliott*, 274 N.W.2d 75, 78 (Minn. 1978); *Hogan v. Hogan*, 796 S.W.2d 400, 407 (Mo.App.1990). Given the speculative nature of future Social Security benefits, we do not consider this approach to be wise, and we affirm the trial court's refusal to consider Vicki's Social Security benefits.

### 5. *SBS Waiver*

C.B. also argues that the court erred in dividing C.B.'s SBS benefits evenly in light

---

**7.** Indeed, in Vicki's settlement brief, she admits that "C.B. is entitled to some consideration for the post-separation payments that he has made to maintain the marital estate." (citing *Ramsey*, 834 P.2d at 809).

of Vicki's signed waiver of her right to anything other than 25% of such benefits in the event of C.B.'s death. C.B. states that Vicki should not be given more in the divorce proceeding, at the expense of C.B.'s heirs, than that to which she voluntarily limited herself. The court correctly ruled that Vicki's waiver did not limit her to a 25% share of the benefits. Beneficiary designation is concerned only with disposition of account benefits upon C.B.'s death; it has no bearing on the valuation and division of this marital asset upon divorce. This court has previously established that SBS benefits earned during marriage are marital property subject to equitable division upon divorce. *Mann*, 778 P.2d at 592. Nevertheless, we have found that the court did not properly address other significant aspects of the overall property distribution. Therefore, on remand, we leave open the possibility that, if the court finds that C.B. deserves more than 50% of the marital property, the even division of the SBS benefits may ultimately be inappropriate.

## IV. *CONCLUSION*

The trial court's use of the *Wanberg* method is AFFIRMED. As provided above, the court's findings regarding the characterization of property, its valuations, and its equitable distribution are AFFIRMED in part, REVERSED in part and REMANDED for further proceedings consistent with this opinion.

## ADDENDUM

### Trial Court's Findings of Fact

1. The parties are residents of the State of Alaska;

2. The parties were married February 23, 1985, and ever since that time have been husband and wife;

3. There are no children born of the marriage, no children were adopted during the marriage, and plaintiff is not now pregnant. The parties lived with and supported two (2) children of the plaintiff's first marriage;

4. The parties separated in August 1991, and for the purposes of choosing a date for valuing the marital estate that date is the best for this case;

5. An incompatibility of temperament exists between the parties which is irremediable;

6. The defendant has sought to have the court use an unwinding procedure to cause the parties to be returned to *status quo ante* but this marriage of 6½ years (to separation) is one in which the commingling of assets was general;

7. The equity value of the premarital residences of the parties were combined to purchase the marital residence;

8. The parties have stipulated to the value of the following:

| Asset | Market Value | Less Liability | Net Value |
|---|---|---|---|
| Deshka Property | $28,000 | (12,450) | $15,550 |
| Airboat | $6,000 | | $6,000 |
| 1989 Blazer | $12,000 | | $12,000 |
| Parker & Parsley | $4,200 | | $4,200 |
| C.B. PERS | $48,982 | | $48,982 |
| C.B. SBS | $41,201 | | $41,201 |
| C.B. Defer. Comp. | $64,195 | | $64,195 |
| C.B. IRA | $6,000 | | $6,000 |
| Vicki IRA | $6,000 | | $6,000 |
| Vicki 401K | $15,200 | | $15,200 |

9. The court adopts the market value and debt of the following which were not completely agreed to:

| Asset | Market Value | Less Liability | Net Value |
|---|---|---|---|
| Pokey Circle | $62,500 | ($ 62,047) | |
| 2710 Kingfisher | $145,000 | ($137,200) | |
| Dean Witter | $1,000 | | $1,000 |
| C.B. Checking | $2,555 | | $2,555 |
| Vicki Checking | $288 | | $288 |
| Personal Injury | $1,648 | | $1,648 |
| 1991 Tax Refund | $2,300 | | $2,300 |

10. The court finds that the PERS and SBS benefits should be divided by QDRO. The applicable factor to be applied is "½ × 77/total months in the program × any disbursal of the program."

11. The court understands from the parties that the deferred compensation portion is not subject to application of a QDRO;

12. The parties stipulated that the court could consider the existence and payment of premarital debt. The court gives little weight to this. The choice to use marital assets in payment of premarital debt under the circumstances of this case does not call for a substantial shift in the distribution of the marital estate upon divorce. The evidence did not reflect overreaching or fraud between spouses on this issue and the decision to pay one's debts rather than to pur-

chase additional things or savings does not automatically call for rebalancing the divorce equation;

13. The court divides the parties' marital estate as follows:

| Asset | To C.B. Cox | To Vicki Cox |
|---|---|---|
| 8260 Pokey Circle | $1 | |
| 2710 Kingfisher | $1 | |
| Deshka Property | | $15,500 |
| Airboat | | $6,000 |
| 1989 Blazer | | $12,000 |
| Parker & Parsley | | $4,200 |
| Dean Witter | | $1,000 |
| C.B. Checking | | $2,555 |
| Vicki's Checking | | $288 |
| Personal Injury | | $1,648 |
| C.B. Defer. Comp. | $64,195 | |
| C.B. IRA | $3,000 | $3,000 |
| Vicki IRA | | $6,000 |
| Vicki 401K | | $15,200 |
| 1991 Tax Refund | $2,300 | |
| Vicki Insurance | | $541 |

14. The court does not consider the various children's accounts to be marital assets, but rather property of the children.

15. In addition to ¶ 13, minor personal property has already been divided. The combination of that division and that contained in ¶ 13 is an equitable distribution.