NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JASON TINSLEY, | ) | |
| | ) | Supreme Court No. S-15249 |
| Appellant, | ) | |
| | ) | Superior Court No. 4FA-12-01068 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| MOLLY NAKAYAMA, | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 1515 – August 27, 2014 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Fourth Judicial District, Fairbanks, Bethany Harbison, Judge.

Appearances: Jason A. Weiner, Gazewood & Weiner, P.C., Fairbanks, for Appellant. Daniel L. Callahan, Callahan Law Office, Fairbanks, for Appellee.

Before: Fabe, Chief Justice, Stowers, Maassen, and Bolger, Justices. [Winfree, Justice, not participating.]

## I.     INTRODUCTION

Jason Tinsley and Molly Nakayama brought suit to dissolve their marriage and determine custody of their two children. Molly plans to relocate to Portland, Oregon, and the superior court found her move to be motivated by legitimate reasons. After considering the requisite statutory factors, the superior court awarded primary physical custody of the two children to Molly. Jason appeals the custody award, arguing

---

\*       Entered under Appellate Rule 214.

that the superior court erred in its consideration of expert and custody investigator testimony; in its consideration of the required statutory factors; and in its findings on the legitimacy of Molly's relocation and Jason's involvement with marijuana. He also appeals the superior court's determination that money transferred to him from his grandparents' trust to fund a construction project constituted a gift rather than a loan and is therefore not a marital debt.

We conclude that the superior court did not err in its custody determination or in its characterization of the transferred funds, and we affirm the superior court's decision.

## II. FACTS AND PROCEEDINGS

### A. Jason And Molly's Marriage And Preliminary Divorce Proceedings

Jason Tinsley and Molly Nakayama were married on January 17, 2007, in Fairbanks, where they continue to reside. Jason is from Fairbanks, where he has family and personal connections; Molly is from Portland, Oregon and moved to Fairbanks shortly before they were married. They have two young children, ages five and three. Both children were born in Fairbanks and have lived there since birth.

Jason filed for divorce on January 31, 2012, though the couple did not separate until May 16, 2012. On June 4, 2012, the superior court entered temporary orders awarding shared legal and physical custody of the two children during the pendency of the divorce action. The superior court held hearings in this case in May 2012 and January 2013 before conducting a trial on May 6-8, 2013.

### B. Custody Investigator's Report

The superior court appointed a child custody investigator, Jocelyn Bowman, who submitted her report to the superior court on April 26, 2013. By the time of the custody investigation, Molly had made clear her intention to relocate to Oregon, and Bowman characterized "the issue before the Court [as] essentially one of permission

for [Molly] to relocate to the Portland, Oregon area, where she was raised and where she has family and friends, with the two children over [Jason's] strenuous objections."

Bowman found that the two boys are "physically healthy, energetic, inquisitive children" with "an affectionate and close relationship with each parent," but she was concerned about "the high level of animosity and expressed hostility between these parents, such that [the older son], particularly, has been exhibiting high levels of stress and becomes emotionally distraught with uncontrollable crying."

Each parent accused the other of substance abuse, particularly with marijuana and alcohol, and Bowman investigated these allegations. Bowman found that "[t]here have been references from differing sources including [Jason] himself of a history of extensive marijuana use by [Jason] which he has described as *a personal choice*." (Emphasis in original.) She found that the family's residence, "which [Jason] designed and built . . . was designed around a 'grow room' for up to 24 marijuana plants, which [Jason] reportedly removed upon advice of counsel. Sources reference [Jason] as having sold high quality marijuana in the past." Jason completed a substance abuse assessment. He was diagnosed with "Cannabis Dependence," but there was no recommendation that he complete a substance abuse program because the results of a hair follicle test were reported to be negative. Bowman summarized her findings by noting that Jason "has had an extensive involvement with significant use, cultivation, and sale of marijuana, to which he has indicated he may choose to return despite having reportedly ceased such involvement during this litigation." Molly also completed a substance abuse assessment, which "indicated no substance abuse or dependence at this time and no indication for treatment."

Bowman also reported that on 12 occasions Jason videotaped [the older son], who was "inconsolably crying while being driven by [Jason]." The custody investigator expressed her concern "that a parent with a distraught child strapped into a

car seat while driving should pull the car over as soon as possible and offer immediate and effective comfort to that child." Although the custody investigator accepted Jason's purpose "to document his son's distress for recommendations from a psychologist/parenting consultant," she identified "serious questions about [Jason] not recognizing [his son's] immediate need and the long term effects for a child of remaining inadequately consoled on repeated occasions."

Bowman ultimately recommended shared legal custody with Molly having primary physical custody if she is permitted to relocate to Oregon with the children.

## C. Divorce Trial

At the May 2013 trial, the superior court heard three days of testimony regarding a number of property division issues as well as child custody issues. This appeal concerns the child custody determination as well as one item of debt in the property division.

### 1. Child custody findings and determination

#### a. Molly's move to Portland

The primary issue before the superior court was who should have primary physical custody of the children in light of Molly's planned relocation to Portland. Molly testified about her desire to pursue education in nursing, her plan to reside with her father and stepmother in Portland for up to a year, the presence of her extended family in Portland, and the availability of medical treatment in Portland for her kidney condition.[1] She argued that her motivation to move to Portland was legitimate, and she pointed to the fact that she had expressed the intent to move ever since Jason initiated the divorce in January 2012. According to Molly, "[h]er only tie to Fairbanks has been her marriage to Jason."

---

[1] Molly has a chronic kidney condition, which requires medical monitoring.

### b.    Expert testimony

The superior court heard testimony from several expert witnesses, including Bowman, the court-appointed custody investigator, and Julieann Pankey, an expert hired by Jason.  The court's consideration of Pankey's testimony and the alleged bias of Bowman are at issue in this appeal.

Pankey is an adjunct professor at the University of Alaska Fairbanks with training in child behavioral health.  The superior court qualified her as "an expert in child behavioral health and family systems."  Pankey proceeded to offer extensive testimony about her observations of Jason's and the children's behavior.

Because Pankey had no personal contact with Molly, her conclusions about Molly's parenting abilities were based on examination of transcripts from the pre-trial hearings as well as observation of Molly at one of the hearings.

After considering Pankey's testimony, qualifications, and sources, the superior court concluded that

> [b]ecause Dr. Pankey was not able to interview [Molly] or observe her with the children, her opinion about [Molly's] parenting and about which parent should have custody of the children is being given no weight.  Dr. Pankey was not able to conduct a custody investigation given [Molly's] nonparticipation in her efforts to do so.  However, the court finds Dr. Pankey's opinion about [Jason's] parenting useful and finds that [Jason] is a fit parent who loves his children very much.

The other expert testimony at issue in this appeal was that of Bowman, who reiterated the concerns in her report about Jason videotaping the older son in distress while driving to an exchange with Molly.  In its final custody decision, the superior court indicated that "[i]n deciding which parent should have primary physical custody of the children, the court has given great weight to the opinion of Ms. Bowman.  Her report and

testimony are well thought-out, fair, and take into consideration the statutory considerations set out by AS 25.24.150."

### c. Substance abuse

In regard to the evidence of substance abuse that directly affects the well-being of the children, the superior court found:

> Both parents smoke marijuana. [Molly] occasionally abuses alcohol. [Jason] has been diagnosed with cannabis dependence. The court finds that at this time, substance abuse is not directly affecting the children's well-being. The court again cautions, however, that if either parent's use of marijuana or alcohol in the future begins to negatively impact the children, the court may view this as a substantial change in circumstances that may warrant modification of this order.

The superior court further found that "[Jason] grows marijuana in order to use and sell it. By engaging in this criminal conduct, [Jason] risks arrest and separation from his children."

Jason's marijuana growing operation has been an issue throughout the case's progress in the trial court. At a hearing on May 1, 2012, Jason indicated that although he had halted his growing operation, he expected to continue to grow his own marijuana plants again in the future. On May 14, 2012, Jason testified more extensively about his growing operation and recent marijuana use:

> Q: You testified on the 1st that you expect at some point that you will go back to growing marijuana yourself?
> A: Yeah.
> Q: And would that be shortly after this court case is done?
> A: If the judge said that you need to stop growing marijuana, I would stop growing marijuana. If the judge said I needed to stop smoking pot, I would stop smoking pot to have my kids in my life . . . . I don't know when I'll grow again.
>
> . . . .

Q: When did you last smoke marijuana?
A: Two weeks ago.
. . . .
Q: Has it been since our first hearing?
A: Yes, I have smoked since our first hearing.

At the divorce trial, Ryan Tinsley, Jason's brother, also testified about Jason's history of growing and selling marijuana. Ryan testified that before Jason's marriage to Molly, selling marijuana was Jason's primary source of income. At trial, Bowman expressed her concern that marijuana involvement would likely be an issue in the future for Jason because of his significant past involvement.

### d.    Facilitating a relationship

In regard to the desire and ability of each parent to facilitate a relationship with the other parent, the superior court found:

> Both parents have demonstrated some reluctance to foster an open and loving frequent relationship between the children and the other parent. The court finds that once these proceedings are over, this is likely to change. The court expects [Molly] to do everything possible to encourage [the children] to have an open and loving relationship with [Jason]. . . . Future failure by either parent to encourage the children's relationship with the other parent, if such failure adversely impacts the children, may be viewed by this court as a substantial change in circumstances that could warrant modification of this order.

### e.    Geographical stability

In regard to the issue of geographical stability and continuity, the superior court found:

> The children have always lived in Fairbanks. They have longstanding family ties to this community. They have also lived with each of their parents since they were born. However, the children are very young, and the court finds that they will likely transition to a new community fairly

easily. They have not yet begun to attend school or to be active in organized sports and activities, and for this reason the court places less weight on the desirability of having them continue to live in Fairbanks than it would if they were somewhat older.

### f.    Emotional needs

The superior court also found that "[Molly] is better able to meet the children's emotional needs as she is better able to keep the stress of the parents' acrimony from the children and to protect them from inappropriate exposure to expressions of sadness and anger."

### g.    Custody determination

The superior court found that "both parents are fit parents," but that "[g]iven [Molly's] planned residence in Portland, it is not possible for the parents to share physical custody of the children." The superior court found that Molly's "planned move to Portland is 'legitimate,' " and "[t]herefore, the court has analyzed the best interests of the children assuming that the parents reside in different states." The superior court concluded that, considering the statutory factors, it was in the best interests of the children for the parents to share legal custody and for Molly to have primary physical custody of the children with visitation for Jason.

### 2.    Marital debt

There is only one property division finding at issue in this appeal: the superior court's finding that the money provided to Jason by his grandmother, Sally Porter, from a revocable trust to fund a construction project was a gift, rather than a loan, and therefore was not a marital debt. The superior court considered the testimony of Jason, his grandmother, and Molly, and it "relie[d] heavily on the testimony of [Jason's] grandmother, Sally."

Sally testified that in July 2010, she talked with Jason and Molly and offered to finance Jason's construction of a house on land that she deeded to him. Beginning in 2010, she transferred money from the trust into an account controlled by Jason, who withdrew funds as needed for construction as well as living expenses.

On January 30, 2012, the date that Jason filed for divorce and a year and a half after Sally started the transfer of funds, Jason drafted and signed a promissory note for the construction funds, unilaterally choosing a repayment date of January 1, 2015. Jason explained at trial that he prepared the promissory note to protect his grandmother's money in anticipation of divorce.

After considering the testimony, the superior court found that "all money provided to [Jason] by [his grandparents'] Trust from July 2010 going forward was a gift to him." The superior court "relie[d] heavily" on Sally's testimony and found that "based on her testimony, it is clear that she had donative intent in transferring the money to [Jason]." The superior court supported this finding by noting that Sally "did not require that any paperwork be signed before giving the money to [Jason]" and that "[i]t was [Jason] who wanted to sign paperwork, and it was he who chose the 'rate of interest.' " The superior court additionally found that if Jason "does not 'repay' this money to the trust, there will be no financial consequence to him." For these reasons, the superior court concluded that "all sums transferred to [Jason] from his grandmother and/or the Harry and Sally Porter Trust were gifts to him rather than loans and therefore will not be considered to be part of the marital estate."

Jason appeals these findings and conclusions.

## III.   STANDARDS OF REVIEW

"A superior court has broad discretion in determining child custody matters."[2] "We will not reverse a superior court's custody determination unless we are 'convinced that the trial court abused its discretion or that its controlling factual findings are clearly erroneous.' "[3] In the custody context, a superior court abuses its discretion "when it 'fails to consider statutorily mandated factors, weighs factors improperly, or includes improper factors in its decision.' "[4] A superior court's factual finding "is clearly erroneous when a review of the entire record leaves us with the 'definite and firm conviction' that a mistake has been made."[5] We will "not 'readily second guess a trial court's custody determination because it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence.' "[6] Questions of law, such as interpreting the requirements of the custody statute and the proper legal tests to be used in the superior court, are reviewed de novo in this court, "adopting the rule of law that is most persuasive in light of precedent, reason and policy."[7]

"We review a trial court's decision to admit or exclude evidence for abuse of discretion, and will reverse such a decision only if the error affected the substantial rights of a party. Similarly, we generally review a trial court's decision to admit expert

---

[2]   *Williams v. Barbee*, 243 P.3d 995, 1000 (Alaska 2010) (citing *Wee v. Eggener*, 225 P.3d 1120, 1124 (Alaska 2010)).

[3]   *Id.* (quoting *Michele M. v. Richard R.*, 177 P.3d 830, 834 (Alaska 2008)).

[4]   *Id.* (quoting *Michele M.*, 177 P.3d at 834).

[5]   *Id.* (quoting *Wee*, 225 P.3d at 1124).

[6]   *Id.* (quoting *Michele M.*, 177 P.3d at 834).

[7]   *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994) (citing *Lantz v. Lantz*, 845 P.2d 429, 431 n.1 (Alaska 1993)).

testimony for abuse of discretion. But when the admissibility of evidence or expert testimony turns on a question of law, we apply our independent judgment."[8] "We apply the abuse of discretion standard to review a trial court's decisions relating to appointment of a child custody investigator and admission of the investigator's report into evidence."[9]

"There is a rebuttable presumption that transfers of funds between close relatives are not actual debts. We review the superior court's characterization of such transfers of funds as 'loans' or 'gifts' for clear error."[10]

## IV. DISCUSSION

### A. The Superior Court Did Not Err In Its Consideration Of The Testimony Of Jason's Expert, Julieann Pankey.

Jason argues on appeal that the superior court failed to consider the report and testimony of his expert witness, Dr. Julieann Pankey. Jason takes issue with the superior court's decision to "give[] no weight" to Pankey's "opinion about [Molly's] parenting and about which parent should have custody of the children." The superior court's consideration of Pankey's testimony was based on its finding that "Pankey was not able to interview [Molly] or observe her with the children." The superior court did, however, expressly credit Pankey's testimony about Jason's parenting abilities.

Jason also argues that the superior court erred by failing to comment on Pankey's concerns regarding Molly's substance abuse. But the superior court was presented with other testimony on Molly's substance abuse that it apparently found more persuasive, giving "great weight to the opinion" of the custody investigator, Bowman,

---

[8] *Marron v. Stromstad*, 123 P.3d 992, 998 (Alaska 2005) (citations omitted).

[9] *Littleton v. Banks*, 192 P.3d 154, 157 (Alaska 2008) (citation and internal quotation marks omitted).

[10] *Osterkamp v. Stiles*, 235 P.3d 178, 191 (Alaska 2010) (citations omitted).

who reported that "[a]t this moment in time, it does not appear that substance abuse is a primary or significant factor in [Jason's or Molly's] abilities to parent."

We have indicated that "[t]he weight to be given to expert testimony is within the province of the trier of fact."[11]  The superior court considered Pankey's qualifications and experience, as well as her basis of knowledge in this case and determined that it would give weight to her conclusions about Jason's fitness as a parent but not to her conclusions about Molly's fitness.  Given the deference afforded to the superior court's factual findings in a child custody case,[12] the superior court did not abuse its discretion in relying only on testimony encompassing Pankey's firsthand knowledge.  We conclude that the superior court did not err in its consideration of Pankey's testimony.

**B.** **The Superior Court Did Not Err In Its Consideration Of Jason's Involvement With Marijuana.**

Jason argues on appeal that the superior court erred in its finding about Jason's past and potentially continuing involvement with growing and selling marijuana. Jason argues that the testimony at trial only related to Jason's past sale of marijuana rather than his current activities.

There is evidence in the record concerning Jason's involvement with growing and selling marijuana, including evidence of the marijuana grow room that Jason built into the family's residence; Jason's plan to resume growing marijuana at some point in the future unless he was expressly forbidden to do so by the superior court as a condition of custody; and Jason's extensive past involvement with the sale of

---

[11]     *State v. Phillips*, 470 P.2d 266, 272 (Alaska 1970).

[12]     *Williams v. Barbee*, 243 P.3d 995, 1000 (Alaska 2010) (citing *Wee v. Eggener*, 225 P.3d 1120, 1124 (Alaska 2010)).

marijuana. At trial, Bowman also expressed concern that marijuana involvement would likely be an issue in the future for Jason because of his significant past involvement.

Given the evidence in the record, we cannot conclude that the superior court's consideration of Jason's past and possible future involvement with marijuana was clearly erroneous.

**C.      The Superior Court Did Not Err In Finding Molly's Planned Relocation To Portland To Be Legitimate.**

We have "set forth a two-step approach for analyzing a custodial parent's desire to move out-of-state with a child. First, the superior court must consider if reasons for the planned move are legitimate. A move is legitimate if it was not primarily motivated by a desire to make visitation . . . more difficult. Second, if the move is legitimate, the superior court must analyze the best interests of the child while assuming that the planned move has already occurred."[13]

Jason argues that the superior court erred in its finding that Molly's "planned moved to Portland is 'legitimate.' " But he fails to point to any evidence or legal authority to support an argument that Molly's primary motivation for her planned relocation was to make visitation more difficult. The superior court heard ample testimony regarding Molly's desire to pursue education in nursing, the presence of her extended family in Portland, and the availability of medical treatment in Portland for her kidney condition. We conclude that the superior court did not err in finding her move to be legitimate.

---

[13]      *Eniero v. Brekke*, 192 P.3d 147, 150 (Alaska 2008) (omission in original) (internal quotation marks and citations omitted).

**D.** **The Superior Court Did Not Err In Its Findings Under AS 25.24.150(c)(5) Or In Its Consideration Of That Factor.**

"Among other statutory custody factors listed in AS 25.24.150(c), paragraph (5) requires that, in making a custody decision, a court must consider 'the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity.' The statute's plain language requires the court to view continuity and stability both prospectively and retrospectively: the court must examine both the time that a child 'has lived' in a stable environment and 'the desirability of maintaining [that] continuity.' "[14]

Jason argues that the superior court made inadequate findings under AS 25.24.150(c)(5) and failed to properly consider the importance to the children of remaining in Fairbanks. Jason claims that the superior court ignored the fact that the children have lived in Fairbanks for their whole lives and have longstanding ties to the community through Jason and his family. But the superior court specifically considered the children's ties to Fairbanks, the importance of geographical stability, and the desirability of maintaining continuity:

> The children have always lived in Fairbanks. They have longstanding family ties to this community. They have also lived with each of their parents since they were born. However, the children are very young, and the court finds that they will likely transition to a new community fairly easily. They have not yet begun to attend school or to be active in organized sports and activities, and for this reason the court places less weight on the desirability of having them continue to live in Fairbanks than it would if they were somewhat older.

---

[14] *Meier v. Cloud*, 34 P.3d 1274, 1279 (Alaska 2001) (alteration in original).

Alaska Statute 25.24.150(c)(5) is not limited to consideration of geographic stability and continuity, particularly when one parent relocates to another state:

> [A] court considering the child's need for continuity and stability in this context [of one parent's decision to move to another state] must examine not only the desirability of maintaining geographical continuity, but also the importance of maximizing relational stability. A continuity test centered entirely on the child's geographical stability would always favor placing the child with the non-moving parent. Yet our decisions recognize that courts may properly award primary custody to the relocating parent when that parent offers superior emotional stability. Thus, the continuity and stability factor does not preordain the result in such cases; instead, it commands a comprehensive inquiry into "each parent's respective ability to maintain stable and satisfactory relations between themselves and the child."[15]

In this case, the superior court found that Molly "is better able to meet the children's emotional needs as she is better able to keep the stress of the parents' acrimony from the children and to protect them from inappropriate exposure to expressions of sadness and anger." The superior court clearly considered the desirability of geographical stability but placed greater weight on Molly's ability to better meet the children's emotional needs. Such a conclusion is well within the superior court's "broad discretion in determining child custody matters,"[16] and we conclude that the superior court did not err in this regard.

E.    **The Superior Court Did Not Err In Its Finding Under AS 25.24.150(c)(6) Or In Its Consideration Of That Factor.**

Alaska Statute 25.24.150(c)(6) states that "[t]he court shall determine custody" by considering, among other factors, "the willingness and ability of each parent

---

[15]    *Id.* (citations omitted).

[16]    *Williams*, 243 P.3d at 1000 (citing *Wee*, 225 P.3d at 1124).

to facilitate and encourage a close and continuing relationship between the other parent and the child."

Jason argues that the superior court "avoided making a finding regarding the desire and ability of each parent to allow an open and loving frequent relationship between the child and the other parent." But the superior court made a specific finding under AS 25.24.150(c)(6):

> Both parents have demonstrated some reluctance to foster an open and loving frequent relationship between the children and the other parent. The court finds that once these proceedings are over, this is likely to change. The court expects [Molly] to do everything possible to encourage [the children] to have an open and loving relationship with [Jason]. . . . Similarly, when the children are visiting with [Jason], he must encourage them to have an open and loving relationship with [Molly] . . . . Future failure by either parent to encourage the children's relationship with the other parent, if such failure adversely impacts the children, may be viewed by this court as a substantial change in circumstances that could warrant modification of this order.

The superior court's finding on this statutory factor is consistent with the custody investigator's report, which noted instances of both parents failing to facilitate a positive relationship between the children and the other parent. The superior court clearly considered "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child,"[17] but did not find that this factor favored either parent. We have previously upheld the superior court's findings where "there was no evidence either parent was significantly superior

---

[17] AS 25.24.150(c)(6).

to the other" in regard to a custody factor and the "evidence was largely in balance."[18] This seems to be the case here. There is support in the record for this finding, and we conclude that the superior court did not clearly err.

F.    **The Superior Court Did Not Err By Failing To Disqualify The Custody Investigator For Alleged Bias.**

In its final custody decision, the superior court indicated that "[i]n deciding which parent should have primary physical custody of the children, the court has given great weight to the opinion of Ms. Bowman. Her report and testimony are well thought-out, fair, and take into consideration the statutory considerations set out by AS 25.24.150." Jason alleges that Bowman was biased in her report and testimony and argues that the superior court "erred in failing to consider the bias of custody investigator Jocelyn Bowman, and her testimony regarding a video that she never viewed."

Alaska Rule of Civil Procedure 90.6(d)(2) provides that "[u]nless otherwise ordered, the custody investigator's report is deemed to be admitted into evidence upon filing." In general, we review a trial court's decision to admit evidence or an expert witness for abuse of discretion, except where admission turns on a question of law.[19] In particular, "[w]e apply the abuse of discretion standard to review a trial court's decisions relating to appointment of a child custody investigator and admission of the investigator's report into evidence."[20]

Jason had earlier moved to disqualify Bowman for bias based on comments allegedly made by the custody investigator's office at an early neutral evaluation

---

[18]    *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 138 (Alaska 1997).

[19]    *Marron v. Stromstad*, 123 P.3d 992, 998 (Alaska 2005).

[20]    *Littleton v. Banks*, 192 P.3d 154, 157 (Alaska 2008) (citation and internal quotation marks omitted).

meeting.  The superior court held an evidentiary hearing on Jason's motion to disqualify Bowman and denied the motion, finding that "the statements that [Jason] attributes to the child custody investigator's office were not made."  Jason does not appeal the denial of his motion to disqualify, nor does he argue that the superior court's finding at the evidentiary hearing was clearly erroneous.

Jason's other basis for alleging bias is Bowman's testimony regarding the incidents of Jason videotaping the older child in distress while riding in the car with Jason.  In her report, although Bowman makes clear that her conclusions on the parents' relative ability to meet the children's emotional needs were not based solely on those incidents, she did highlight her concerns regarding Jason's actions:

> While this investigator's opinion is not based on only a few examples, the situation where, according to [Jason], on 12 occasions he videoed [the older child] inconsolably crying while being driven by [Jason], bears repeating.  It is the opinion of this investigator that a parent with a distraught child strapped into a car seat while driving should pull the car over as soon as possible and offer immediate and effective comfort to that child . . . .  Whatever [Jason's] need or motivation, which he describes as to document his son's distress for recommendations from a psychologist/parenting consultant, there arise serious questions about [Jason] not recognizing [his son's] immediate need and the long term effects for a child of remaining inadequately consoled on repeated occasions.

Jason argues that Bowman could not draw these inferences regarding Jason's parenting ability without actually viewing the videos he took of the older child.  But Bowman's comments were based on the fact that Jason repeatedly videotaped a distressed child in this context rather than on the specific content of each video.  Bowman relied on Jason's own characterization of the videotaping incidents, and Jason does not argue that she mischaracterized his comments.  The superior court's

consideration of Bowman's report and testimony are well within its discretion, and we conclude that the superior court did not err by failing to disqualify Bowman or her report.

G.      **The Superior Court Did Not Abuse Its Discretion By Awarding Molly Primary Physical Custody.**

After examining all the relevant custody factors and making the requisite statutory findings, the superior court ultimately concluded Molly should have primary physical custody.  Jason relies on the arguments discussed above to assert that the superior court abused its discretion by awarding Molly primary physical custody.  We have made clear that we will "not 'readily second guess a trial court's custody determination because it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence.' "[21]  Given that none of Jason's arguments challenging the superior court's findings or consideration of evidence have merit, we conclude that the superior court did not abuse its discretion in making its custody determination.

H.      **The Superior Court Did Not Err By Characterizing The Funds Transferred From Sally Porter To Jason To Fund A Construction Project As A Gift Rather Than As A Loan.**

Jason appeals the superior court's characterization of the money provided to Jason by his grandmother, Sally Porter, as a gift rather than as a loan.  The superior court found that "all money provided to [Jason] by [his grandparents' trust] from July 2010 going forward was a gift to him.  The court relies heavily on the testimony of [Jason's] grandmother, Sally Porter, in making this determination, and based on her testimony, it is clear that she had donative intent in transferring the money to [Jason]." Jason challenges this finding as clearly erroneous.

---

[21]      *Williams*, 243 P.3d at 1000 (quoting *Michele M. v. Richard R.*, 177 P.3d 830, 834 (Alaska 2008)).

Sally testified that in July 2010, she offered to finance Jason's construction of a house on land that she deeded to him. Sally testified that although she expected to be repaid at some point in the future, she did not ask Jason to sign a promissory note. Although the superior court "relie[d] heavily" on Sally's testimony, it appears that the court did not find credible Sally's testimony that she expected to be repaid. Instead, the superior court looked to other indicia of intent, particularly the facts that Sally "did not require that any paperwork be signed before giving the money to [Jason]" and that Jason "did not sign a promissory note or deed of trust until on or after January 30, 2012, which was the same date that he filed the complaint for divorce in this case and which was after substantial funds had already been transferred to him from the Trust." When asked about the due date on the promissory note, Sally testified that she "didn't require this" and that Jason "made that date up." There is no evidence in the record of any repayments made by Jason to the trust over a 17-month period.

There is support in the record for the superior court's finding of donative intent, and its finding is not clearly erroneous.

V. **CONCLUSION**

The superior court's decision is AFFIRMED in all respects.