**MICHELE M., Appellant,**

v.

**RICHARD R., Appellee.**

No. S–12510.

Supreme Court of Alaska.

Feb. 29, 2008.

Michele M., pro se, Anchorage.

No appearance by Appellee.

Before: FABE, Chief Justice,
MATTHEWS, EASTAUGH, and
CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. INTRODUCTION

Michele M. and Richard R. dispute who should have custody of their son, Charles.[1] Richard and Michele initially had agreed that Michele should have primary legal and physical custody over Charles and Richard would have some visitation rights. Richard later moved to gain full custody of Charles after it became clear that Charles was doing poorly in school due in part to a high number of unexcused absences. Richard was tempo-

rarily awarded custody in April 2006. After a two-day trial in late 2006, Superior Court Judge Mark Rindner made Richard's primary physical and legal custody of Charles permanent. Michele now appeals that award of custody. She argues that the superior court improperly weighed several "best interest" factors and did not take into account Richard's history of domestic violence. Michele is arguing pro se. Richard has elected not to participate.

## II. FACTS AND PROCEEDINGS

Charles was born in 1992 to Michele and Richard. Michele and Richard have never been married to each other. Richard was briefly married to Theresa C. a few years after he met Michele. Michele and Richard lived together for one year before Charles was born, and stayed together until Charles was about six months old. Michele had primary custody of Charles, and an informal visitation schedule was maintained by the parties; basically, Richard would have Charles for one or two days a week. Richard had one child with his ex-wife, a daughter named Jessica, and has full legal and physical custody of her. He now lives with his partner, Carol, and her daughter from a previous relationship, Jennifer.

The visitation arrangement made by Charles and Michele worked, or seemed to, for several years. In April 2000, however, Richard asked that he be able to see Charles on Sundays and Mondays, in order to better accommodate his work schedule. Michele initially agreed. But after trying out this arrangement for a few months, Michele petitioned for sole legal and primary physical custody of Charles. She alleged that Richard was being uncooperative with her and was behaving irresponsibly around Charles, citing one instance where Richard went to a bar and "made [Charles] sit outside of the bar while he sat in the bar drinking and partying." She was also concerned about the amount Richard was paying in child support.

Richard moved to continue joint legal custody and maintain the recently agreed-to visitation schedule (where Charles would visit

---

1. Pseudonyms are used for the children through-   out this opinion to protect their privacy.

Richard on Sundays and Mondays); he also proposed mediation. The parties tried mediation but it was unsuccessful, and they went to trial in 2001. In its findings of fact and conclusions of law made on October 2, 2001, the court awarded the parties joint legal custody but gave Michele physical custody and the right "to decide which extracurricular activities that [Charles] shall be involved in." The court also set out an elaborate visitation schedule. That visitation schedule was modified somewhat the following year in a stipulated agreement made by the parties.

The superior court made two points in its 2001 findings of fact that are germane to this present case. First, the court noted that "there is some evidence that [Charles] has had a problem with attendance and tardiness in school." At the time, the court seemed to divide responsibility for Charles's absences and tardiness equally between the parties.

Second, the court noted that "[a]s to [Richard], he appears to have a history of entering into relationships with women who have alcohol problems which lead to domestic violence problems." The court continued that "[a]lthough there is a record of some domestic violence issues having been prosecuted against [Richard] and some prosecuted by him regarding his subsequent relationships, the court finds that these incidences are irrelevant to the issues in this case." The court found "more telling" the fact that Richard was awarded full custody of Jessica, his daughter from a previous marriage.

In September 2004 Richard moved for joint legal custody with a provision for "disputed issues" to be resolved by Richard and for the parties to have shared physical custody, on a "one week on, one week off" schedule. In his affidavit supporting his motion, Richard expressed concern that Charles had been absent numerous times from school during the years in which Michele had primary physical custody of Charles and cited "[Michele's] utter failure in meeting [Charles's] educational needs." According to Richard's motion, during the 2003–2004 school year "[Charles] missed approximately 57.5 days of school" and "[m]any of the days that Mother did get [Charles] to school, he was several hours late." At this point, Rich-

ard was living with another woman, Carol, who had custody of her daughter, Jennifer.

At a settlement conference on September 2, 2005, the parties entered into an agreement. In that agreement, the parties maintained joint legal custody of Charles, but physical custody was changed "from primary physical custody with [Michele] to shared physical custody." The agreement provided that the number of days Richard would have custody would increase until (in summer 2007) the visitation schedule would become one week on and one week off. The agreement also added provisions that, should Charles's grades fall or his school absences increase, Richard would have control over where Charles went to school and what activities he could participate in, especially hockey. Because of Charles's continued poor grades, in December 2005 Richard was granted (over Michele's objection) the right to transfer Charles to a school closer to Richard's residence.

On January 31, 2006, Richard filed a motion for primary physical and legal custody of Charles. Richard stated in his affidavit accompanying the motion that "[Charles] missed an excessive amount of school during the first semester" of the school year, and he reported that Charles had been absent eighteen times from one of his classes. Michele challenged the motion. A hearing was scheduled for April 13, 2006. Michele indicated that she was not prepared for a full trial on whether Richard should have physical custody of Charles. The court postponed the trial but entered an interim order that awarded sole legal custody and primary physical custody to Richard. Michele states in her brief that she allowed this change in custody "based on my unwillingness to fight in court anymore and the fact that I could not afford an attorney."

During the time the interim order was in place, Michele filed a request for emergency intervention for Charles. In her notice of the filing, Michele wrote that "[Charles] needs to be placed in an in-patient treatment center . . . for intensive therapy to deal with his current issues that include past physical abuse and current mental and emotional abuse from his father, Richard." Richard

denied the accusations made in Michele's motion for emergency intervention, and he accused Michele of withholding visitation of Charles from him.

A hearing was held over the course of two days, November 29 and December 4, 2006. At the trial, Michele (who appeared pro se) called several witnesses, including police officers, Charles's social worker, and Theresa, Richard's ex-wife. Charles's social worker, Heather Rough, testified that Charles considered Richard's home "chaotic" and "stressful." She also noted that Richard was being investigated for alleged abuse against his daughter Jessica. One police officer testified about taking a report of abuse against Jennifer, and Heather Rough testified that Jennifer had been removed from Richard's home for a short time. Charles's therapist said that Charles had told him that there was "violence" in the household. Theresa testified that Richard had struck her.

At the end of the hearing, the court awarded primary physical and sole legal custody to Richard based on the factors listed in AS 25.24.150 and made its interim order permanent. The court went through, in order, the various statutory "best interests" factors in AS 25.24.150, finding that nearly all of them favored the placing of Charles with Richard.[2] In general, the court allowed that Richard had been heavy handed toward Charles at times, but felt that Charles had been manipulating his mother and needed the discipline which his father seemed able to provide.

In assessing Charles's needs (the first statutory factor), the court maintained that Charles's educational progress had been severely hampered by his excessive absenteeism. It briefly discussed Charles's physical health and found it not to be an issue and that Michele exaggerated Charles's health problems (Michele has repeatedly alleged that Charles suffered because of his allergies whenever he stayed with Richard). The court further concluded that Michele had demonstrated a total lack of ability to meet Charles's needs, especially his educational needs, and that Richard was in a better position to do so (the second factor).

The court found that Charles was, in its opinion, immature and manipulative; as a result, the court did not credit Charles's preference to be in the custody of his mother (the third factor). Charles was fourteen at the time of the ruling.

For the fourth statutory factor, the "love and affection existing between the child and each parent," the court observed that it was obvious that Charles loved his mother and that both parents loved Charles. The relationship between Richard and Charles was "strained" at best, according to the court. But the court found that the environment of Charles's father's house was better for Charles and that it was desirable that the father continue with custody (the fifth factor). The court held that Richard and Michele did not work especially well together in supervising Charles, but that they generally obeyed court orders, if reluctantly (the sixth factor).

The court ruled that there was no "competent evidence" of "significant domestic violence" between Richard and Carol or by Richard against his children (the seventh factor). There was one report of domestic abuse still under investigation at the time of the court's ruling and the court expressed concern about the number of allegations, but declared that there was "way too much calling of the police" by both Richard and Michele and too much investigation by others. The accusations of domestic abuse, according to the court, were mostly a proxy for disagreements between Richard and Michele. The court noted that Michele had been arrested for violating a domestic violence restraining order obtained by Richard, but observed that there was no real threat to Richard presented by Michele. The court

**2.** The best interest factors are: (1) the physical, emotional, mental, religious, and social needs of the child; (2) the capability and desire of each parent to meet the child's needs; (3) the child's preference to live with either parent; (4) the love and affection between the child and both parents; (5) the length of time the child has lived in a stable environment, and the desirability of maintaining continuity; (6) the willingness of each parent to foster a relationship between the child and the other parent; (7) any evidence of domestic violence; (8) evidence of substance abuse. The court may also consider any other factors it deems pertinent. AS 25.24.150(c).

concluded that there was "no evidence whatsoever" that Charles was being harmed or hurt in Richard's care. The court found that substance abuse was not a serious concern for either parent (the eighth factor).

### III. STANDARD OF REVIEW

This court will normally defer to the trial court's decision on custody. We will not "reverse a trial court's resolution of custody issues unless, after a review of the entire record," we are "convinced that the trial court abused its discretion or that its controlling factual findings are clearly erroneous."[3] Abuse of discretion occurs when a trial court fails to consider statutorily mandated factors, weighs factors improperly, or includes improper factors in its decision.[4] We will conclude that a trial court's factual finding is "clearly erroneous" when we are left with a "definite and firm conviction that the ... court has made a mistake."[5] In general, we do not "readily second guess a trial court's custody determination"[6] because it is "the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence."[7]

### IV. DISCUSSION

Michele makes three major claims in her brief, apart from evincing a general dissatisfaction with the court's custody ruling. She first argues that the court placed too much emphasis on Charles's educational needs, to the exclusion of other factors which she claims favor her. Second, she alleges that the court ignored evidence that Richard had committed domestic abuse in the past and that his household was one in which Charles would witness and be subject to abuse. This claim is actually two arguments: (1) that the court improperly discounted evidence of domestic violence, which should have been given weight in the overall best interests analy-

sis, and (2) that the court should have applied AS 25.24.150(g) which states that if the court finds a parent has a "history of perpetrating domestic violence" there should be a presumption against awarding custody to that parent. Third, Michele argues that Charles's preference for living with her should have been given greater weight. We affirm the lower court's decision on the first and third points, but remand for further fact finding on the issue of domestic violence.

#### A. The Superior Court Did Not Abuse Its Discretion in Placing Significant Weight on Charles's Educational Needs.

Michele initially argues that the court erred in considering "the best interests of the child," which include his "physical, emotional, mental, religious, and social needs."[8] Michele contends that the order awarding custody to Richard gave an "overriding importance to [the] one factor" of improving Charles's performance at school. She cites *Smith v. Weekley*,[9] a case in which this court remanded a custody decision because the superior court seemed to rely exclusively on one statutory factor (the perceived stability of leaving the child in the custody of his father). Michele believes that the court similarly abused its discretion in placing too much weight on Charles's educational needs.

The court did place an emphasis on Charles's education, identifying it as one of Charles's greatest needs under AS 25.24.150(c)(1). But such an emphasis is unsurprising in this case. The September 2, 2005 custody order, which made physical custody of Charles shared, contained a stipulation that Richard would "assume responsibility for choosing which school [Charles] attends and in which activities he may participate" if Charles did not maintain a C average or was absent more than two days per

3. *Valentino v. Cote*, 3 P.3d 337, 339 (Alaska 2000).

4. *Gratrix v. Gratrix*, 652 P.2d 76, 80 (Alaska 1982).

5. *Siekawitch v. Siekawitch*, 956 P.2d 447, 449 (Alaska 1998) (citation omitted).

6. *Dingeman v. Dingeman*, 865 P.2d 94, 96 (Alaska 1993).

7. *Knutson v. Knutson*, 973 P.2d 596, 599–600 (Alaska 1999).

8. AS 25.24.150(c)(1).

9. 73 P.3d 1219, 1227 (Alaska 2003).

semester.[10] And it was because of Charles's continued absenteeism that Richard moved for primary custody, leading to this latest trial. Based on the evidence, the court found that Michele had been unable to meet Charles's educational needs. In contrast, the court stated that Charles "has a long way to go, but [was] clearly making progress" in school under Richard's care. The court also heard testimony from two faculty members at Charles's school indicating that he was attending classes and having a better year compared to last year.

Moreover, this case is distinguishable from *Smith*. In that case, there was evidence that the superior court did not consider all the statutory factors and instead based its decision on only one statutory factor.[11] Here the court did consider all the factors. We find no abuse of discretion in the superior court's decision to prioritize Charles's education needs given Charles's need to make progress in that area.

### B. The Superior Court Did Not Make Appropriate Findings Regarding Evidence of Domestic Violence by Richard.

■ In its October 2, 2001 findings of fact and conclusions of law memorandum, the court wrote that "[Richard] ... appears to have a history of entering into relationships with women who have alcohol problems which lead to domestic violence problems." The court added that "there is a record of some domestic violence issues having been prosecuted against [Richard]" but concluded that "the court finds that these incidents are irrelevant to the issues in this case." The 2001 findings found that the fact that Richard was awarded custody of his daughter from an earlier marriage was "more telling" than his record of domestic violence.

Because this memorandum was issued prior to the 2004 amendment to the best interests statute, the court confined its analysis of Richard's domestic violence to a determination of whether custody with Richard or Michele would be in Charles's "best interests." The court determined that there was not anything about domestic violence "with regard to either party that warrants consideration in this decision." At that time, Michele was awarded custody.

At the 2006 hearing, Michele called witnesses who testified to alleged incidences of domestic violence against Jessica (Richard's daughter from a previous marriage), against Jennifer (the daughter of Richard's current partner), and against Theresa (Richard's first wife). Whether there was any substance to the contemporary allegations involving Richard's children was not established; there were certainly *allegations* of domestic violence, but not much objective corroboration of them. Jennifer was removed from Richard's home for a short period of time, according to a social worker called as a witness by Michele. An incident of abuse by Richard against Jessica was still under investigation at the time of the trial. Jessica and Charles seem to have also reported cases of abuse, but these do not seem to have been substantiated by any outside authority. The court also found Charles's testimony as to abuse to be unreliable.

The allegations of abuse from Richard's previous relationship with Theresa, however, are somewhat more substantiated. Theresa testified at the 2006 hearing to being shoved by Richard in 1998. She was granted a restraining order against Richard; Richard was charged with domestic violence at that time. Theresa later dropped the charge in the hopes of reconciling with Richard. Theresa also stated, bluntly, that there had been "plenty" of domestic violence in her relationship and marriage with Richard and that Richard had struck her. The court seemed skeptical of Theresa's testimony based on the fact that Richard was ultimately awarded custody of his daughter with Theresa.

But in its most recent ruling, the court did not revisit the older allegations against Richard made by Theresa.[12] Instead, the court

---

**10.** Richard eventually was granted the right to choose Charles's school under this agreement.

**11.** *Smith*, 73 P.3d at 1227.

**12.** The court noted that Theresa testified. But the court only cited her testimony in relation to abuse allegations made about her daughter, Jes-

focused on the flurry of domestic abuse allegations that had recently been made by Michele and others. Most of these the court found to be spurious and unsubstantiated. The court stated at the conclusion of the trial that there was no "competent evidence" which supported the claim that Richard recently engaged in acts of domestic violence. In one exchange with Michele during the trial, Michele seemed to acknowledge the near total lack of objective evidence of recent abuse by Richard.[13]

In her brief, Michele argues that "[t]he trial court had an obligation in the best interests of [Charles] to consider Theresa's [Richard's first wife's] testimony of 'several' instances of domestic violence and 'many' domestic violence petitions filed by both Richard and Theresa ... as competent evidence ... and consider the criminal charge ... under AMC 8.05.030(B)(1) Assault DV." [14] In general, she maintains that the court's findings regarding recent domestic abuse do not merit deference because they "contradict[ ] the evidence" that was presented at trial. Michele further insists in her brief that AS 25.24.150 as amended should apply in this case, and that Richard should be required to rebut the presumption that he should not have custody of Charles because he has a history of domestic violence.[15]

If we treat domestic violence as simply a "factor" in the best interests analysis, then the superior court's decision as to Charles's best interests should stand. Much of the court's decision turns on its evaluation of the credibility of Charles, Michele, and the several witnesses Michele called.[16] The court found, based on their testimony and the lack of objective corroboration of domestic violence, that Richard was not abusive to Charles and that the evidence tying Richard to other contemporary instances of abuse was weak, at best. The court was within its discretion in finding that Charles would not be going to an abusive home if Richard were to be awarded custody.

The more difficult question is whether Richard should have been subject to the presumption found in AS 25.24.150(g), which applies to those who have been found to have a "history of perpetrating domestic violence." In its earlier decision the court seemed to rule that Richard has had a history of domestic violence ("there is a record of some domestic violence issues having been prosecuted against [Richard]").[17] At the latest trial, the court mentioned in passing the previously made factual findings on domestic violence.[18] But the court did not note any potential tension between the current ruling and the 2001 memorandum.

Alaska Statutes 25.24.150(c)(6) and (7) both stress that a court in a child custody hearing should consider possible evidence of domestic

---

sica, not about the abuse she claimed that she suffered.

13. There was this exchange between the court and Michele:

Judge: We've heard from many police and every time the police have come and investigated ... they found that [Charles] was either manipulating the situation or was exaggerating the situation. Do you recognize that?

Michele: I do recognize that. However, I think that Richard ... is a better liar.

Judge: So even though third parties who are trained to make those kinds of determinations are there, you take [Charles's] side? ....

Michele: ... [For the officers,] it's hard to make a ten minute assessment of a situation....

Michele went on to say that she felt it was better to err on the side of believing Charles's accusations of abuse, rather than disbelieving them.

14. Michele speculates that one reason the court did not consider Theresa's testimony was "because it had occurred" before the effective date

of the 2004 domestic violence amendment to the best interests statute.

15. The title of section III of Michele's brief is "The Court Erred By Failing To Apply AS 25.24.150(g) to This Case."

16. See Knutson v. Knutson, 973 P.2d 596, 599–600 (Alaska 1999) (function of trial court to assess credibility of witnesses).

17. One might believe that the finding that Richard has a history of domestic violence is less than direct: the court only refers to "history of entering into relationships" that led to domestic violence "problems" as well as a "record of some domestic violence issues having been prosecuted against [Richard]."

18. The court stated: "I made findings about that in my original custody order back in 2001."

abuse. In 2004 the legislature amended AS 25.24.150 to create a rebuttable presumption against placing a child in the custody of a parent with a history of "perpetrating domestic violence." [19] In a recent case interpreting the new amendment, *Puddicombe v. Dreka*, this court held that "when the record shows that domestic violence has occurred and the court so finds, it is plain error for the court not to make findings as to whether the domestic violence amounted to a history of perpetrating domestic violence." [20] If a history of domestic violence is found, then the lower court must test, per AS 25.24.150, whether the presumption against awarding custody to the parent with a history of abuse has been overcome.[21]

In *Puddicombe* the trial court heard "extensive testimony" on domestic violence and made a finding that "domestic violence ... was mutual" between the parents.[22] However, despite making this finding, the trial court in *Puddicombe* did not go on to consider, explicitly, whether the violence it found was serious enough to constitute a "history of perpetrating domestic violence" under AS 25.24.150(h). "A parent has a history of perpetrating domestic violence," according to the statute, if the court finds that "during one incident of domestic violence, the parent caused serious physical injury or the court finds that the parent has engaged in more than one incident of domestic violence." [23] In *Puddicombe*, we held that the lower court record demonstrated that there were incidents of domestic violence, and that it was "plain error" for the court not to make "findings as to whether the domestic violence amounted to a history of perpetrating domestic violence." [24] Accordingly, we remanded the case for further findings as to whether the violence by either party satisfied the statutory definition of perpetrating domestic violence.

We are faced in the present case with an analogous situation. The superior court heard testimony, especially testimony from Theresa, that Richard had committed acts of domestic violence. Theresa also testified to one incident of shoving that resulted in physical injury. In addition, the superior court incorporated its previous findings on domestic violence, made in its 2001 memorandum. Those findings strongly suggested that Richard had engaged in some acts of domestic violence.

The evidence of domestic violence in this case is not as overwhelming as it appeared to be in *Puddicombe*. Indeed, the court may have implicitly determined that Richard's past acts of domestic violence were neither numerous nor significant and so did not amount to a "history of perpetrating domestic violence" under AS 25.24.150(h). In the present case, the court did not make any findings that domestic violence had occurred, or was even a serious concern: the thought seems to have been that there was a lot of smoke but not much fire.

But while this may be a correct assessment of the flurry of recent allegations made by Michele and Charles, the same does not seem to be obviously true of the testimony of Theresa. Here, there was unrebutted testimony by a witness as to the existence of domestic abuse; moreover, although the superior court in this case did not make any findings regarding Richard's domestic violence against Theresa, it did do so in its 2001 memorandum.[25] We find that the cumulative impact of all the evidence was enough to satisfy the standard of *Puddicombe:* the record shows domestic violence has occurred and the court has found (in a previous holding) that it occurred. As a result, it was plain error for the court not to further determine whether Richard's previous acts of domestic violence constituted a "history of

19. AS 25.24.150(g).

20. 167 P.3d 73, 77 (Alaska 2007).

21. *Id.* ("If such a history is found then the path charted in subsection .150(g)-(i) must be followed.").

22. *Id.* at 75–76.

23. AS 25.24.150(h).

24. 167 P.3d at 77.

25. The 2001 decision, however, does not name Theresa as a person that Richard has had "domestic violence problems" with: in fact, it does not name anybody.

perpetrating domestic violence" under AS 25.24.150(h). If the court finds that Richard has such a history, "then the path charted in subsection .150(g)-(i) must be followed." [26]

### C. The Superior Court Did Not Abuse Its Discretion by Disregarding Charles's Preference To Live with His Mother.

■ Michele also challenges the superior court's decision not to give any weight to Charles's preference for living with his mother. In making its ruling, the court noted that the relevant standard under the statute was not merely chronological age, but also capacity.[27] Although Charles's clear preference was for his mother and Charles was normally of an age where his preference should be given some weight, the court believed that Charles lacked the emotional maturity for his preference to be credited. Charles was deemed by the court to be too "manipulative" and likely preferred his mother (the court intimates) because she was more easily manipulated.

In her brief, Michele cites testimony as to Charles's preference, and notes various persons who have commented on Charles's maturity. She also cites the court's statement that Charles has "good social skills." She ends by listing reasons why Charles might rationally prefer to live with his mother, such as his belief that his father's house is chaotic and stressful.

■ Trial courts have discretion in determining what weight to give a child's preference. In some cases, the child's preference can be a deciding factor, if that choice is well-reasoned and made by a mature teenager.[28] However, in cases where a child does not show maturity or there is evidence that the choices were motivated by bad reasons, the court may choose to disregard the child's preference, or to give it little weight.

In *Jenkins v. Handel,* for example, this court found that the preferences of two children (ages thirteen and fifteen) were not to be given much weight because "their preferences, and the reasoning behind them, evidenced a great need for parental supervision." [29] A closely related rationale seems to motivate the superior court's conclusion in this case. The court believed that Charles had been successfully manipulating his mother to miss school and to play hockey, and that his preference for living with his mother reflected his desire to continue this pattern of manipulation. The court stated that Charles needed the discipline that his father would (it hoped) provide and accordingly disregarded Charles's clear preference to be in the custody of his mother. The court did not abuse its discretion in giving more weight to Charles's need for discipline than to Charles's preference to live with his mother.

## V. CONCLUSION

The court did not abuse its discretion in emphasizing Charles's educational needs, nor did it abuse its discretion in disregarding Charles's stated preference to live with his mother. However, given the evidence presented at trial and the superior court's 2001 decision which indicated the possibility that Richard may have a "history of perpetrating domestic violence" under AS 25.24.150(h), we VACATE the award of custody to Richard and REMAND for findings in accordance with AS 25.24.150(g)-(i). The court may order a supplemental hearing if in the judgment of the court a supplemental hearing will be useful or necessary.

---

**26.** *Puddicombe,* 167 P.3d at 77. According to AS 25.24.150(g)-(i), there is a rebuttable presumption against awarding custody to a parent with a history of domestic violence. However, that presumption can be overcome if a parent has met certain requirements, such as attending a program for batterers and not engaging in substance abuse.

**27.** *See* AS 25.24.150(c)(3) (best interests of child includes "child's preference if the child is of sufficient age and capacity to form a preference").

**28.** *See, e.g., Valentino v. Cote,* 3 P.3d 337, 340–41 (Alaska 2000) (well-reasoned preference of fourteen-year-old was deciding factor).

**29.** 10 P.3d 586, 590 (Alaska 2000).