*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JAMES R., | ) | |
| | ) | Supreme Court No. S-15128 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-12-05207 CI |
| v. | ) | |
| | ) | O P I N I O N |
| KYLIE R., | ) | |
| | ) | No. 6872 – March 7, 2014 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Mark Rindner, Judge.

Appearances: Mitchell K. Wyatt and Rhonda F. Butterfield, Anchorage, for Appellant. Gayle J. Brown, Anchorage, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.

I.      INTRODUCTION

Two parents shared joint custody of their child during the pendency of their divorce, but the father's plans to move out of state led both parents to seek primary physical custody upon the father's relocation. The superior court granted primary physical custody to the mother, concluding that all of the statutory factors but one were

neutral between the parents but that the mother was more likely than the father to facilitate a close and continuing relationship between the other parent and the child.

The father appeals. He argues that the superior court erred in two ways: first, by failing to find that the father had superior capability to meet the child's needs, and second, by prompting the father to discuss his concerns about the mother's parenting and then holding those concerns against the father in the continuing-relationship determination. We affirm the superior court's determinations in all respects.

## II.  FACTS AND PROCEEDINGS

### A.  The Relationship

Kylie R. and James R. were married in July 2010.[1] Kylie gave birth to their daughter in July 2011.

James deployed with his Army unit to Afghanistan in December 2011 on a tour that was originally slated to last until October 2013. James and Kylie's relationship soured in the following months, and Kylie and their daughter moved out of the marital home at some point. (The exact date was disputed by the parties.) On February 5, 2012, Kylie sent James a message on Facebook that James paraphrased at trial as saying, "I'm moving out, James. I'm filing for divorce." Worried, James obtained permission to leave Afghanistan early and returned to Alaska on February 13, 2012 to deal with his deteriorating family situation.

### B.  Preliminary Proceedings And Domestic Violence Petitions

On February 9, 2012, Kylie filed a complaint for divorce against James in which she sought primary physical and sole legal custody of their daughter. James

---

[1]  We use initials in lieu of the parties' last names to protect the family's privacy.

counterclaimed for divorce on March 13, 2012, seeking primary physical and legal custody.

The parents filed a total of five petitions for 20-day and long-term domestic violence protective orders against each other in the course of their divorce action. In all but one petition, the court initially granted the 20-day protective order ex parte but subsequently dissolved the short-term protective order and denied the petition for a long-term protective order after a hearing or on the mutual request of the parties.[2]

One petition ultimately led to a long-term domestic violence protective order. James petitioned for 20-day and long-term domestic violence protective orders against Kylie on February 22, 2012. Among other allegations, James focused on two particular incidents: one in December 2011, in which Kylie allegedly smoked marijuana and neglected their daughter for an evening, and another on February 21, 2012, in which Kylie allegedly came to James's house, grabbed their daughter without his permission, put their daughter with Kylie's sister in the back seat of a car, and sped off without their daughter having appropriate winter clothing or a car seat. The court granted a 20-day ex parte domestic violence protective order the same day.

In the subsequent hearing on March 6, 2012, the superior court found that the marijuana incident did not constitute domestic violence because "[t]he evidence

---

[2]     Kylie petitioned for short- and long-term domestic violence protective orders on February 9, 2012. After initially granting the short-term order ex parte, the court dissolved the short-term order and denied the long-term order by mutual request of the parties. Kylie petitioned again on May 10, 2012 on behalf of herself and her daughter. The 20-day order was granted ex parte but dissolved after a hearing in which the petition for a long-term protective order was denied. The judge warned the parties to "stop playing the DV [domestic violence] game." James petitioned on behalf of his daughter on August 14, 2012. The court granted a 20-day ex parte order that was subsequently dissolved after a hearing in which the superior court also denied the motion for a long-term protective order.

indicates that regardless of whether or not there was marijuana smoking or drinking of five or six beers over a six-hour period, [the parties' daughter] was properly cared for." But the court found that the February 21 incident, in which Kylie "grab[bed]" the parties' daughter, constituted domestic violence on the ground that driving a child in winter without a snowsuit or car seat constituted reckless endangerment.[3]  Nevertheless, the superior court found that this was a "short one-time incident" and that "there was no history involving domestic violence" such that "there is [no] need . . . for further protection of the child from the mother."  The superior court entered a long-term domestic violence protective order on March 6 requiring Kylie to "not threaten to commit or commit acts of domestic violence."

At the close of this domestic violence hearing, the superior court ordered the parents to share interim custody with a schedule of two days on, two days off.

C.     **Custody Hearing And Evidence Presented**

Both James and Kylie sought primary physical custody of their daughter. Even if the parents so desired, shared custody could not continue indefinitely:  James was slated to separate from his military service on March 7, 2013, and he planned to relocate to North Carolina at that time to be closer to family and to start his studies to become a nurse.

The final hearings to determine custody of the parties' daughter were held on December 18 and 31, 2012.  James began his direct testimony by introducing several exhibits of pictures showing him and his daughter at bath time and various holidays and celebrations.  After 15 minutes of detailed direct testimony relating to these pictures, Kylie's attorney interrupted to stipulate that James is a fit parent and can meet their

---

[3]     Because the issue is not raised here, we do not consider or decide whether the superior court correctly concluded that this incident constituted reckless endangerment that could form the basis of a finding of domestic violence.

daughter's needs. The superior court responded by reminding the parties about the time available for the hearing, acknowledging Kylie's stipulation, and stating, "I'm not going to decide dad versus mom on a primary parent basis based on pictures. . . . I'm just telling you that the fact that there's a lot of pictures of holidays and events isn't . . . why I'm going to decide this case." The trial court notified James what it was interested in hearing about: the purpose of the move to North Carolina, an alleged Army disciplinary issue involving James, proposed visitation schedules, "issues about substance abuse," and "any allegations as to issues with the other parent. I mean, you've raised them in your trial brief, so it's no surprise that some sort of neglect, if you will, and the home condition it was left and what all that was — why all that was." The court was quick to assure James, "You can use your time [as] you want to . . . but you don't need to show me pictures[.] I'm going to make a finding that he's capable of . . . meet[ing] her needs." The superior court clarified, "I'm certainly interested in hearing if there is a marked difference in attitude and capabilities. I'm not sure I know that at this point that there's a marked difference so far, but I'm certainly willing to hear evidence to the contrary."

James testified that when he returned from Afghanistan on February 13, the house was a mess with bags of trash blocking the front door, moldy baby bottles and dirty dishes scattered around (including a dish James thought had not been washed since he deployed in early December), fly strips covered in flies, food containers and old food throughout the house, unsanitary conditions in the bathroom and sinks, and dirty diapers on the floor. James argued that this evidence indicated that Kylie "can't maintain a household" when she is parenting alone. He argued that the pictures were indicative of their daughter's living conditions while James was away because he asserted that Kylie moved out mere hours before James moved back in. In turn, Kylie testified that she moved out of the marital house in January 2012 "shortly after" James left for Afghanistan. She had taken on a female boarder to help pay the rent before she moved

out, and she thought that the female boarder's boyfriend had moved into the house once Kylie left and before James returned home. In response to the court's question about whether she recalled the house looking like James's description while Kylie and their daughter were living there, Kylie responded, "No, I don't remember it looking like that at all." She testified, "I know that I wasn't the clean[est] person back then. Not all of that was me. . . . I had a messy roommate. I was not in the house for a certain amount of time. . . . [I]f I could go back, I would have spent more energy taking care of the house, which is what I do now and what I will continue to do."

## D. Superior Court Findings Of Fact And Conclusions of Law

At the conclusion of the hearing, the superior court speculated that "there's no doubt in my mind that the Court would order that [the parents] share custody" if James were going to stay in Alaska, but James's impending relocation to North Carolina required awarding custody primarily to one parent. The superior court awarded primary physical custody to Kylie once James has left the state, finding that all but one of the statutorily mandated custody factors were neutral between the parents[4] and that Kylie

---

[4] The superior court found that the parties' daughter's needs under AS 25.24.150(c)(1) were those of a "typical 17-month-old girl"; that their daughter was "too young to express a custodial preference" under AS 25.24.150(c)(3); that "[b]oth parents have love and affection for [their daughter], and both express a desire to care and provide for [their daughter]'s needs" under AS 25.24.150(c)(4) and AS 25.24.150(c)(2); that "both [parents] have stable lives to an appropriate degree" under AS 25.24.150(c)(5); that neither parent had abused substances under AS 25.24.150(c)(8) in a way that "directly affected [the parties' daughter]"; and that abuse, neglect, and domestic violence were not factors in this case under AS 25.24.150(c)(7).

The superior court elaborated upon the latter conclusion by explaining that the court "would not have likely found domestic violence" in the car seat incident had it known about facts that later came to light. The superior court also stated that it was not concerned about James's accusations about the unsanitary conditions of the home

(continued...)

was more likely than James to facilitate a close and continuing relationship between their daughter and the other parent.

The superior court stated in its written findings that "both parents meet a minimal level of capacity to meet [their daughter]'s basic needs" under AS 25.24.150(c)(2), and that the court "declines to make a comparative finding as to which parent is more capable or most capable to meet [their daughter]'s needs." The superior court's oral findings elaborated that the parents had been sharing custody since the prior February; that "[t]hey both recognize that if they were living in the same state, they'd share custody"; that James and Kylie have "different approaches" to parenting; that both James and Kylie were "still learning" to be parents; and that "they're both capable of meeting [their daughter]'s needs."

Finally, the superior court found that the "most important custody factor in this case" was AS 25.24.150(c)(6): "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child." In its written findings, the superior court observed that "James has a poor opinion of Kylie" and that "if James were awarded primary physical custody, it is not likely that he would foster or encourage a close and continuing mother-daughter relationship." In its oral findings, the superior court elaborated that this factor is about "more than just saying . . . 'we're happy to have you see your kid.' It involves telling the kids that their mom or their dad is a good person, that their mom or their dad should be encouraged to have contact with [the child]." The court explained that "what I'm

_____

[4](...continued)
when James returned on February 13 because it was unclear "whether these photographs depict [the parties' daughter]'s actual living conditions while she was in Kylie['s] . . . physical custody before James returned" and because "there was no evidence of such living conditions in Kylie's present household."

getting from [James] throughout these proceedings . . . is that mom is, pardon my language, a stripper slut who[] . . . neglects her child, who smokes dope. . . . I realize that people dirty each other up in the context of these hearings . . . [b]ut this is by far one of the worst examples I've ever seen of that."[5]  The court concluded that although James "tells me sure, he thinks it's important for mom to have contact with [our daughter], I frankly don't believe it."  The superior court made it clear that this finding was the deciding factor in awarding primary physical custody to Kylie:  Because "Kylie . . . is more likely to foster and encourage a father-daughter relationship, . . . it is in [the parties' daughter]'s best interest to place her in the primary physical custody of the parent who is more likely to make visitation work."  "For this reason, once James relocates out-of-state primary physical custody of [their daughter] will be awarded to Kylie . . . ."

## E.  Issues On Appeal

James argues on appeal that the superior court erred by finding that both Kylie and James were capable of meeting their daughter's needs and by refusing to make a finding of the relative superiority of James's capability based on the evidence presented at trial.  He also argues that the superior court erred by finding that James is less likely than Kylie to facilitate a relationship between their daughter and the other parent after the superior court first requested that James disclose his concerns about Kylie's parenting and then used those concerns against James.  We reject both arguments and affirm the superior court's custody order.

---

[5]  Kylie was a stripper when she and James first met and married.  But she has since left that job, and at the time of trial she worked for her parents' company doing payroll processing from home.

## III.   STANDARD OF REVIEW

A superior court "has broad discretion in determining child custody matters."[6] We "will not reverse a superior court's custody determination unless we are 'convinced that the trial court abused its discretion or that its controlling factual findings are clearly erroneous.' "[7] In the custody context, a superior court abuses its discretion "when it 'fails to consider statutorily mandated factors, weighs factors improperly, or includes improper factors in its decision.' "[8] A superior court's factual finding "is clearly erroneous when a review of the entire record leaves us with the 'definite and firm conviction' that a mistake has been made."[9] This court will "not 'readily second guess a trial court's custody determination because it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence.' "[10]

Questions of law, such as interpreting the requirements of the custody statute and the proper legal tests to be used in the superior court, are reviewed de novo in this court, "adopting the rule of law that is most persuasive in light of precedent, reason and policy."[11]

---

[6]   *Williams v. Barbee*, 243 P.3d 995, 1000 (Alaska 2010) (citing *Wee v. Eggener*, 225 P.3d 1120, 1124 (Alaska 2010)).

[7]   *Id.* (quoting *Michele M. v. Richard R.*, 177 P.3d 830, 834 (Alaska 2008)).

[8]   *Id.* (quoting *Michele M.*, 177 P.3d at 834).

[9]   *Id.* (quoting *Wee*, 225 P.3d at 1124).

[10]   *Id.* (quoting *Michele M.*, 177 P.3d at 834).

[11]   *Cox v. Cox*, 882 P.2d 909, 913 (Alaska 1994).

## IV. DISCUSSION

### A. The Superior Court Did Not Clearly Err In Finding That Both Kylie And James Were Equally Capable Of Meeting Their Daughter's Needs.

Alaska Statute 25.24.150(c)(2) states that "[t]he court shall determine custody" by "consider[ing]," among other factors, "the capability and desire of each parent to meet the[] needs [of the child]."

The superior court in this case made oral findings that James and Kylie have "different approaches" to parenting, that both James and Kylie were "still learning" to be parents, and that "they're both capable of meeting [their daughter]'s needs." The superior court elaborated that it could not "distinguish[] . . . one [parent] [a]s a better parent than [the] []other. . . . You're different parents from each other with different styles and different ways of approaching life and [your daughter], quite frankly, will benefit from both of those experiences in her life." The court went on in its written findings to "decline[] to make a comparative finding as to which parent is more capable or most capable to meet [their daughter]'s needs."

James argues that the superior court committed legal error by using a "pass/fail" test for the capability factor and refusing to decide that James had superior capability to meet his daughter's needs. He "ask[s] this court to require trial courts to implement a 'relative capability' standard, and to reject the use of a 'minimally capable' type of standard . . . in order accurately to determine a child's best interests." He further argues that the evidence at trial showed that James's capability was "vastly disproportionate" to Kylie's capability such that the superior court clearly erred in finding otherwise. We do not reach James's legal arguments because we reject his

factual predicate. Parents can be different, as here, without one being more capable than the other.[12] And the superior court found both parents to be capable.

James points to the conditions under which Kylie and their daughter allegedly lived while James was deployed in Afghanistan and draws a comparison with the conditions that James allegedly created for their daughter and himself when he returned. He argues that the superior court abused its discretion in refusing to consider "direct evidence of Kylie's inability to meet [their daughter]'s needs" and the fact that she "had created an unsafe environment for a baby" based on the photographs of the messy house that James returned to in February 2012. But the superior court did not clearly err when it concluded that pictures of the family home taken on James's return from Afghanistan do not indicate that the parties' daughter and Kylie lived in those conditions while they lived in the family home. The date that Kylie and her daughter moved out of the home was disputed at trial, and the court did not make a finding of fact on this issue. The superior court should be entitled to conclude that photographs of a messy home an indeterminate number of hours, days, or weeks after Kylie and her daughter moved out, at a time when there were other roommates still living in the house, do not necessarily mean that Kylie was an incapable parent while James was deployed. The superior court's determination is supported by Kylie's testimony indicating that she did not recall the house looking that way when she lived there.

James also argues that the superior court could not reasonably conclude that Kylie was a fit parent based on her recent parenting of their daughter because she has

---

[12]     *See Borchgrevink v. Borchgrevink*, 941 P.2d 132, 138 (Alaska 1997) (upholding a superior court's determination of equal capability in a case where "there was no evidence either parent was significantly superior to the other; each had different strengths and there was evidence each was genuinely trying to deal with the children's needs" such that "[t]he evidence was largely in balance").

been living in Kylie's parents' home and allegedly "a large part of the parenting of [their daughter] seem[s] to be done by Kylie's mother." He then contrasts Kylie's alleged incapability with his own parenting of their daughter upon his return from Afghanistan, including "giving her daily baths, washing her hair, establishing a bedtime routine, teaching her how to brush her teeth, ensuring she had enough sleep, preparing healthy meals for her, and playing with her." But the only evidence he points to is Kylie's testimony that her mother often gives their daughter baths, as well as Kylie's testimony that her "first couple months of parenting were really hard" because she was "doing it by [her]self." The superior court did not clearly err when it balanced these pieces of information against the voluminous testimony of Kylie providing for her daughter's needs by herself. Indeed, the litany of parenting services that Kylie testified to providing to the parties' daughter is nearly identical to the parenting services that James testified to providing.

In sum, the superior court did not clearly err by refusing to find that James has superior capability to provide for the parties' daughter's needs. There was ample evidence to support the superior court's conclusion that both parents are equally capable of meeting their daughter's needs.[13]

---

[13] James also argues in a short paragraph in the appellant's brief that the superior court clearly erred by finding that Kylie and James have equal "desire" to meet their daughter's needs. We reject this argument for two reasons. First, because it is raised in a cursory paragraph with no citation to legal authority, we conclude that the argument is forfeited for inadequate briefing. *See Wilkerson v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 993 P.2d 1018, 1021 (Alaska 1999) ("[S]uperficial briefing and failing to cite any authority constitute abandonment of a point on appeal."). Second, James does not support this argument with independent reasoning but rather states that "[a] parent demonstrates his or her 'desire' to do something by actually doing it" and points to his theory that Kylie has delegated her parenting duties to her mother. Moreover, James's argument that the superior court

(continued...)

Finally, James argues that the superior court abused its discretion by "finding, early in the direct examination of James, that he was 'capable of meeting [his daughter]'s needs,' thus precluding further evidence regarding James's superior capability." But the superior court never precluded James from offering evidence of James's superior capability. The superior court indicated that it was prepared to find that James and Kylie were equally fit, and it reminded James that the court would like to hear about other custody factors. But the superior court was also clear that it was "certainly interested in hearing if there is a marked difference in attitude and capabilities. I'm not sure I know that at this point that there's a marked difference so far, but I'm certainly willing to hear evidence to the contrary." The superior court did not abuse its discretion because it did not refuse to hear and consider relevant evidence;[14] rather, it gave useful indications to counsel about its preliminary thinking and suggested how counsel could most efficiently use the time remaining in the hearing. This was well within the appropriate discretion of the superior court.[15]

---

[13](...continued)
clearly erred in finding that James and Kylie are equally capable of meeting their daughter's needs is premised on the same factual reasoning we have already rejected.

[14]    Indeed, immediately after receiving the superior court's warning, James went on to introduce a large amount of additional evidence attempting to show his superior capability to care for his daughter's needs.

[15]    James also argues in a short paragraph in the appellant's brief that the superior court abused its discretion by making no findings about the "emotional stability" of James or Kylie. He reasons that emotional stability is particularly important when a parent is relocating such that failing to make a finding of emotional stability of either parent is an abuse of discretion. We reject this argument. While a relative-stability finding is within the permissible discretion of a superior court, *see, e.g.*, *Elliott v. Settje*, 27 P.3d 317, 320 (Alaska 2001), we have never stated that a finding of relative emotional stability is mandatory in cases where one party is relocating. We decline to do so now.
(continued...)

**B. The Superior Court Did Not Clearly Err By Finding That James Is Less Likely Than Kylie To Facilitate A Relationship Between Their Daughter And The Other Parent.**

Alaska Statute 25.24.150(c)(6) states that "[t]he court shall determine custody" by considering, among other factors, "the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child."

As noted above, the superior court in this case found that the continuing-relationship factor was the "most important custody factor in this case" and that "if James were awarded primary physical custody, it is not likely that he would foster or encourage a close and continuing mother-daughter relationship." The court concluded that although James "tells me sure, he thinks it's important for mom to have contact with [their daughter], I frankly don't believe it." The superior court made it clear that this finding was the deciding factor in awarding primary physical custody to Kylie: Because "Kylie . . . is more likely to foster and encourage a father-daughter relationship, . . . it is in [their daughter]'s best interest to place her in the primary physical custody of the parent who is more likely to make visitation work." "For this reason, once James relocates out-of-state primary physical custody of [their daughter] will be awarded to Kylie . . . ."

James raises two challenges to the superior court's determination of the continuing-relationship factor. First, he argues that the superior court clearly erred by concluding that James was less likely than Kylie to facilitate a relationship between their

---

[15](...continued)
Indeed, we have upheld superior court findings of fact and conclusions of law in custody cases even when the superior court omits discussion of certain factors. *See, e.g.*, *Ebertz v. Ebertz*, 113 P.3d 643, 649 (Alaska 2005) (holding that the superior court did not err as a matter of law by addressing "most [but not all] of the statutory custody factors that were actively disputed").

daughter and the non-custodial parent. Second, he argues that the superior court abused its discretion "when it directed James to discuss his concerns about Kylie's capability (or incapability) to meet [their daughter]'s needs, then used James's concerns against James to support the Judge's conclusion that James would not facilitate a relationship between Kylie and [their daughter]." (Emphasis removed.)

We reject both arguments. First, the superior court's finding that James was less likely than Kylie to facilitate a close and continuing relationship rests on the superior court's credibility determinations and is further supported by ample evidence on the record. Accordingly, it is not clearly erroneous. The superior court concluded that James's testimony asserting his willingness to foster a relationship was not credible, stating that "[James] tells me sure, he thinks it's important for mom to have contact with [her daughter], [but] I frankly don't believe it." Because it is "the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence,"[16] we decline to disturb the superior court's credibility determination in this case.

There is ample evidence on the record that could support the superior court's determination that Kylie would better facilitate a relationship between her daughter and James, including: a comparison of James's and Kylie's testimony regarding their willingness to facilitate a relationship between their daughter and the other parent;[17]

_____

[16] *Ebertz*, 113 P.3d at 650 (quoting *Knutson v. Knutson*, 973 P.2d 596, 599-600 (Alaska 1999)).

[17] At trial, James testified, "If I get full custody, . . . I'm willing to give Kylie whatever time she wants with [our daughter]. I'm not that comfortable right now with [our daughter] coming up to Alaska for long periods of time [because of my concerns about Kylie's parenting]. . . . I feel that [she] might get neglected. Kylie's welcome to go to North Carolina." By contrast, Kylie testified, "I would do anything to establish and
(continued...)

Kylie's testimony that "the communication with the child about the other parent was the most informative" component of a recent parenting class she took; Kylie's testimony that it is "very unfortunate" that James will not have daily personal contact with his daughter after he moves; Kylie's testimony that "I was a child of a divorced family, so . . . I know how it works[;] . . . it's nothing that anybody needs to spend anytime fighting over"; James's repeated willingness to draw the worst possible inference about Kylie from uncertain information;[18] and Kylie's testimony that James had sent her messages on Facebook that she took to mean that "he does not want me to be part of her life, that he thinks that I am a bad influence and he does not want me to have anything to do with that." To be sure, there was some countervailing evidence as well.[19] But we decline

_____

[17](...continued)
keep a relationship between [our daughter] and James [and James's family]. I will do whatever it takes to do that . . . [.] I will be completely flexible like I have always been and I will do what it takes to give them that time."

[18]     James testified that he was concerned about a picture that Kylie had posted on the internet with text reading, "Children are a blessing: You never know when you'll need blood or a spare kidney." James worried, "Is she going to take [our daughter]'s kidney if she needs one? Is . . . it a parts thing for her?" The superior court, critiquing James's literal interpretation of dark humor and sarcasm, asked, "Do you watch South Park or [T]he Simpson's?"

Similarly, James introduced into evidence pictures of Kylie changing her hair color and argued that those changes indicated worrisome shifts in Kylie's mental state. The superior court responded, "If you're trying to convince me that because a 22-year-old woman changes her appearance that that's like something unusual or significant, you got a ways to go."

[19]     James testified that "Kylie will always be [our daughter]'s mom. . . . Kylie can spend as much time with [our daughter] as she wants . . . . I have no problem maintaining a relationship between the two of them." James also contacted Kylie to solicit pictures of Kylie for a scrapbook he was preparing for their daughter, but Kylie
(continued...)

James's invitation to reweigh the conflicting evidence in this case. We conclude that the superior court did not clearly err in finding that Kylie was more likely than James to facilitate a relationship between their daughter and the other parent.

We also conclude that the superior court did not abuse its discretion by holding James's concerns about Kylie's parenting against James in the continuing-relationship determination.[20] James cites no legal authority to support his argument. But in *Stephanie W. v. Maxwell V.* (*Stephanie W. I*),[21] we held that "[i]n light of the apparent good-faith basis of [the mother's] allegations [of sexual abuse by the father against the child]," the superior court in that case must "re-weigh the 'willingness to allow a close

---

[19](...continued)
had not given James the pictures by the time of the hearing.

[20]    James also argues that the superior court clearly erred in its continuing-relationship determination insofar as it relied on the finding that James held a low opinion of Kylie. James maintains that his low opinion of Kylie does not ineluctably lead to the conclusion that James would not obey a court order that James facilitate a relationship between Kylie and their daughter. But the continuing-relationship factor involves more than mere willingness to follow a court order; the superior court correctly concluded that facilitating a relationship occurs throughout the custodial parent's interactions with the child, many of which would be difficult to police through court order. It is within the broad discretion of the superior court to consider evidence probative of whether a custodial parent is likely to engage in the myriad activities and communications that will foster a real relationship between the child and the non-custodial parent. While evidence of willingness to obey a court order would likely be relevant to this determination, it is not the *only* relevant evidence. Accordingly, we conclude that the superior court did not err by looking beyond the narrow question of whether James was unlikely to follow a court order to facilitate a continuing relationship between Kylie and her daughter.

[21]    274 P.3d 1185 (Alaska 2012).

and continuing relationship' factor."[22] We instructed that "[o]n remand, the court should not consider this factor against [the mother] unless she has continued her unwillingness to facilitate such a relationship in the period after the superior court made its evidence-based finding that [the father] had not abused [the child]."[23] In a more recent case, *Stephanie W. v. Maxwell V.* (*Stephanie W. II*),[24] we reaffirmed this commonsense approach and announced a general rule, holding that, in a custody proceeding, "good-faith allegations by one parent against the other parent regarding behavior relevant to the custody decision and the child's best interests should not be held against the reporting parent in the superior court's continuing-relationship determination where the allegations are based on supporting evidence."[25] We noted that sufficient evidence might be found either in the superior court's "objective credibility determination" or in other "extrinsic evidence."[26] To determine when there is sufficient evidence to exclude good-faith allegations from the continuing-relationship determination, we announced a balancing test: "[T]he superior court must balance two competing goals: the desire of the court to encourage good-faith, objectively credible reports . . . and the need to guard against false reports and to consider a parent's actual unwillingness to foster a relationship with the other parent . . . ."[27]

---

[22] *Id.* at 1191.

[23] *Id.*

[24] ___ P.3d ___, Op. No. 6869 (Alaska, Feb. 28, 2014).

[25] *Id.* at 21.

[26] *Id.*

[27] *Id.* at 21-22.

Balancing those competing interests is a difficult line-drawing problem, and we review the superior court's decision only for an abuse of discretion.[28] We do not see such an abuse in this case. In the ordinary course of litigation in child custody cases, we expect good-faith allegations of misconduct by the other parent when it is relevant to the custody decision and supported by sufficient evidence, even if the allegations are ultimately unproven. But some unsupported allegations fall outside the normal course of litigation and may speak to a parent's unwillingness to foster a relationship. In such a case, the court may consider the parent's litigation conduct to ensure that child custody is ultimately decided in light of the child's best interests, including the child's interest in having the custodial parent foster a relationship between the child and the non-custodial parent. Here, the superior court noted, "I realize that people dirty each other up in the context of these hearings . . . [b]ut this is by far one of the worst examples I've ever seen of that." The superior court elaborated that this conclusion was based on a global assessment of James's conduct throughout the proceedings.[29] Given this background of behavior, we do not conclude that the superior court abused its discretion by relying on James's accusations about Kylie and what they reveal about James in

---

[28]    *Id.*

[29]    The superior court stated, "I base this on observations of testimony, reading the briefs and hearing the language and the descriptions that were used."

Some of the specific facts on the record that the superior court might have relied on include James's repeatedly drawing the worst inference possible about Kylie's parenting based on insufficient information, *see supra* note 18, and the superior court's earlier warning to James during a hearing on a petition for a domestic-violence protective order that he "need[s] to . . . stop playing the DV [domestic violence] game" of filing meritless petitions for domestic-violence protective orders because "dirtying each other up will do nothing to create the kind of relationship you need to have."

determining that James was unlikely to facilitate a close and continuing relationship between Kylie and her daughter.

## V.    CONCLUSION

For these reasons, the superior court's order is AFFIRMED.