NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JOANNE M. SIDNEY<br>f/k/a JOANNE M. GINGERICH,<br><br>               Appellant,<br><br>    v.<br><br>AMOS J. GINGERICH,<br><br>               Appellee. | Supreme Court No. S-17724<br><br>Superior Court No. 3AN-13-10662 CI<br><br>MEMORANDUM OPINION<br>AND JUDGMENT[*]<br><br>No. 1820 – March 3, 2021 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Dani R. Crosby, Judge.

Appearances: Dan Allan, Law Offices of Dan Allan & Associates, Anchorage, for Appellant. Maurice N. Ellis, Law Office of Maurice N. Ellis, Anchorage, for Appellee.

Before: Bolger, Chief Justice, Winfree, Maassen, Carney, and Borghesan, Justices.

## I.     INTRODUCTION

Joanne Sidney and Amos Gingerich have been locked in a child custody dispute since they separated in 2013. Gingerich currently has sole legal and primary physical custody of their minor son. Sidney appeals the superior court's most recent visitation order, which limits her visitation to alternating weekends and major holidays. Sidney argues that the court: (1) failed to apply a statutory presumption in favor of equal

---

[*]     Entered under Alaska Appellate Rule 214.

access to the child; (2) abused its discretion by giving too much weight to her past violations of court orders and not enough weight to her recent good behavior; and (3) abused its discretion by giving insufficient weight to her child's preference. Finding no error or abuse of discretion, we affirm the superior court's ruling.

## II.    FACTS AND PROCEEDINGS

### A.    Divorce

Joanne Sidney[1] and Amos Gingerich married in 1987 and divorced in 2015. They had seven children, one of whom is deceased; only the youngest is still a minor.

Sidney filed for divorce in November 2013. Of the parties' four then-minor children, the parties stipulated that the two older children would live with Gingerich and would not be forced to have contact with their mother. The court appointed a child custody investigator. The investigator's report noted, among other things, Sidney's strained relationships with her older children. For the two younger children, Jessica and Noah,[2] the investigator recommended joint legal and shared physical custody.

The parties entered into a child custody agreement in June 2014. Gingerich retained sole legal and primary physical custody of the two older children, while Sidney and Gingerich shared custody of the two younger children on an alternating week-on/week-off schedule.

Within a few months the parties agreed that their custody agreement was no longer workable. The court ordered the child custody investigator to file a supplemental report documenting events since the custody agreement was reached. The report stated that Sidney "repeatedly violated the [custody agreement], including

---

[1]    Sidney reverted to her former name "Joanne Sidney" when the parties divorced in September 2015.

[2]    Pseudonyms have been used for the children to protect their privacy.

withholding the children, frequently contacting them during [Gingerich's] custody time, questioning them about time with their father, . . . and making unilateral decisions about their medical and counseling appointments." The investigator recommended that Gingerich receive sole legal and primary physical custody of the two younger children and that Sidney have the children every other weekend.

The superior court held a divorce trial over four days in March and April 2015. The court awarded Gingerich sole legal custody of the three then-minor children, sole physical custody of the oldest minor child, and primary physical custody of Jessica and Noah. Sidney was allowed visitation with Jessica and Noah on alternating weekends and alternating major holidays and school vacations.

**B.  Cross-Motions To Modify Custody And Visitation**

In December 2017 Jessica ran away from Sidney's home and fled to Seward with a friend. She later told her siblings and the child custody investigator that she ran away because her mother's boyfriend was often intoxicated around her. In the days following, Gingerich retrieved Jessica and brought her back to Anchorage.

Sidney then filed a motion to "stop parental alienation," claiming that Gingerich had not let her see the children since retrieving Jessica from Seward. Gingerich filed a cross-motion to restrict Sidney's visitation to professionally supervised visits. Sidney then filed a motion to modify custody, requesting primary custody of the children and child support.

The superior court reappointed the child custody investigator to provide an updated report. The investigator filed an interim report in June 2018, explaining that additional time was necessary "to fully investigate this complicated case." The interim report indicated that although the 2015 custody order gave Gingerich primary custody of Noah, the two had seen each other infrequently since then. The investigator recommended that Noah have "a significant, uninterrupted period of time with his father,

with only monitored contact . . . with his mother." As for Jessica, the report noted that she desired no further contact with her mother and recommended that she remain in Gingerich's sole legal and primary physical custody.

The court issued a written interim order seven days later, largely adopting the investigator's recommendations. The court also ordered Sidney to deliver Noah to Gingerich that evening by dropping Noah off at the café designated for the parties' custody exchanges. An evidentiary hearing on the parties' motions was scheduled for October 2018.

The day after the court issued its interim order, Gingerich filed a motion for an expedited interim hearing, alleging that Sidney had not delivered Noah as ordered the day before. The court granted the motion. The parties eventually exchanged Noah before the interim hearing. At the hearing Sidney claimed that she had dropped Noah off at the designated café, but Gingerich said that Noah never entered the building. Gingerich also testified that after the parties eventually exchanged Noah, Sidney texted Noah and asked him why he had agreed to go with his father. She then instructed Noah to erase the previous message.

At the interim hearing, the court expressed dismay at Sidney's approach to exchanging custody and described her text messages to Noah as "damaging." It granted Gingerich's request that Sidney's visitation be supervised, but stated it would dispense with supervision if the visits went well.

## C.    Custody Investigation Report And Interim Custody Orders

The custody investigator filed her last report in September 2018. The investigator discovered that Noah had expressed concern to his therapist in September 2017 about drunken and angry behavior displayed by Sidney's boyfriend. When the therapist raised this concern with Sidney, she denied that her boyfriend had ever been

violent or aggressive around the children. The therapist "expressed concern about [Noah] being pressured, and possibly coached, to make a choice" between his parents.

The investigator then discussed the AS 25.24.150(c) best-interests factors. She considered only Noah's best interests because Jessica's custody was no longer disputed. The investigator looked unfavorably upon Sidney's actions throughout the custody proceedings and concluded that Gingerich was better able to meet Noah's needs. Regarding whether the court should consider any preference Noah might have, the investigator observed that "[Sidney] has likely coached and pressed [Noah] to say what she wants to hear, and [Noah] is well aware of her anger and outbursts when defied." The investigator felt that Noah "need[ed] time and healing to fully develop the capacity to form a well-reasoned preference." She observed that "[Sidney] has not encouraged a relationship between [Gingerich] and the children, and has actively interfered with and thwarted it for years." The investigator deemed it important for Noah to have an open relationship with his older siblings, which she concluded could happen only while Noah was in Gingerich's physical custody. Finally, the investigator noted instances of "serious alcohol abuse, including anger and inappropriate, drunken behavior" in Sidney's home. Based on these factors, the investigator recommended that Gingerich receive sole legal and physical custody of Jessica and Noah and that Sidney's visitation with Noah be limited to professionally supervised visits once a week for up to four hours.

The court heard testimony from the child custody investigator and both parties at an evidentiary hearing in October and November 2018. Based on this testimony it denied Sidney's motions to stop parental alienation and to modify custody. It granted on an interim basis Gingerich's motion to allow Sidney only supervised visitation. The court ordered that Sidney's visits be supervised for four hours each Sunday by the court-appointed visitation supervisor. If Sidney fully abided by the court's orders and "exercised her visitation without incident," she would soon gain

longer visits and eventually be allowed to visit with Noah unsupervised. The court gave Jessica sole discretion whether to attend Noah's visits with Sidney. It scheduled a status hearing for June 2019 to reassess whether to increase Sidney's visitation.

At the June 2019 status hearing the court took testimony from both parties and the custody supervisor. It then issued an order allowing Sidney to have unsupervised overnight visitation and one week of extended vacation with Noah. It set the next status hearing for November.

### D. Visitation Order And Appeal

The court held its last hearing on Gingerich's motion to restrict visitation in November 2019. At this hearing the court emphasized the custody investigator's concerns about Sidney's effect on Noah; observed that Sidney's recent decision to take Noah to get his learner's permit without telling Gingerich, the custodial parent, arguably reflected "poor judgment"; and noted Sidney's "growing" child support obligation, which at that time totaled $20,052.92. Notwithstanding these issues, the court observed that the current visitation order was "working generally for [Noah]" and expressed an intent to "keep it about the same."

Accordingly, the court modestly increased Sidney's visitation, allowing her unsupervised visitation with Noah every other weekend during the school year and four nights a week over the summer. The parties were required to split time with Noah over winter break and received time with Noah over spring break and Thanksgiving in alternating years. Sidney also received a two-week block of time to take vacation with Noah over the summer.

Sidney moved for reconsideration, arguing that the visitation order improperly punished her for violations of past court orders and failed to take Noah's best interests into account. Sidney urged the court to award her significantly more time with

Noah based on her compliance with court orders in the preceding year and a half. The court denied Sidney's motion. Sidney now appeals.

## III. DISCUSSION

### A. The Superior Court Did Not Err By Declining To Apply AS 25.20.070's Presumption Of Shared Custody.

Sidney challenges the November 2019 visitation order, which modifies the previous custody and visitation order entered in 2015. She argues that the superior court should have applied AS 25.20.070, which establishes a presumption of "equal access to both parents during the time that the court considers an award of custody under AS 25.20.060-25.20.130."[3] But this statute does not apply here. The statute presumes equal access *while the court is considering* a custody award. It does not apply an equal-access presumption to the final award of custody or visitation itself, which is governed by different standards.[4]

The equal-access presumption of AS 25.20.070 applies only "during the time that the court considers an award of custody."[5] In other words, it applies only to interim custody and visitation orders. Final custody and visitation orders are instead governed by AS 25.20.060, which provides that the court "shall award custody on the basis of the best interests of the child."[6] In doing so, the court must consider "all relevant

---

[3]     AS 25.20.070.

[4]     Whether AS 25.20.070 applies to final custody and visitation awards is a question of statutory interpretation that we review de novo. *See Susan M. v. Paul H.*, 362 P.3d 460, 463 (Alaska 2015).

[5]     AS 25.20.070.

[6]     AS 25.20.060.

factors, including those factors enumerated in AS 25.24.150(c)."[7]  When a court is asked to modify an existing custody or visitation award, it may do so only "if the court determines that a change in circumstances requires the modification of the award and the modification is in the best interests of the child," again considering the factors in AS 25.24.150(c).[8]

Unlike AS 25.20.060 and AS 25.20.110, which require the court to award custody and visitation based on the best interests of the child, AS 25.20.070 requires that the child have equal access to both parents in the interim unless such access would be "detrimental to the welfare of the child" or a history of domestic violence is established.[9] Applying the latter statute to final custody and visitation awards would therefore be incompatible with the best-interests standard governing those awards. The superior court did not err in declining to apply the equal-access presumption of AS 25.20.070 in fashioning its final visitation order.

B. **The Superior Court Did Not Improperly Punish Sidney For Her Failure To Comply With Prior Custody Orders; It Properly Considered How Her Actions Affect Her Child's Best Interests.**

As explained above, when ruling on Gingerich's motion to modify visitation, the superior court was required to decide whether modification was in Noah's best interests by weighing the factors set forth in AS 25.24.150(c).  Although the superior court has substantial discretion to weigh these factors in each particular case, it abuses its discretion if it "assign[s] disproportionate weight to particular factors while

---

[7]     *Id.*

[8]     AS 25.20.110(a).

[9]     AS 25.20.070; AS 25.24.150(g).

ignoring others"[10] or relies on "improper factors."[11] Sidney argues that the superior court, in awarding her relatively limited visitation with Noah, abused its discretion by improperly punishing her for past violations of the court's orders and by failing to give enough weight to her more recent compliance with its orders. We conclude that the superior court relied on appropriate factors and did not improperly punish Sidney.

Sidney's concerns about the superior court's rationale are fueled by the court's failure to expressly state the grounds for its final visitation order, either on the record or in writing. Although the court "need not mention each factor by name," its findings must "provide 'a clear indication of the factors [that the court] considered important in exercising its discretion or allow us to glean from the record what considerations were involved.' "[12] The final visitation order did not do this. But because this order was the culmination of a series of interim hearings and orders beginning in June 2018, and because the only difference between the final order and the previous interim order is that the final order grants Sidney longer periods of visitation with Noah, we can discern the court's thinking from the record of these proceedings.[13]

Two concerns are clearly paramount: the need to protect Noah's mental health,[14] and Sidney's unwillingness to facilitate a relationship between Noah and his

---

[10] *Geldermann v. Geldermann*, 428 P.3d 477, 481 (Alaska 2018) (quoting *Riggs v. Coonradt*, 335 P.3d 1103, 1106 (Alaska 2014)).

[11] *Sweeney v. Organ*, 371 P.3d 609, 612 (Alaska 2016).

[12] *Id*. (quoting *Rosenblum v. Perales*, 303 P.3d 500, 504 (Alaska 2013) (alteration in original)).

[13] *Id*.

[14] *See* AS 25.24.150(c)(1) ("the physical, emotional, mental, religious, and social needs of the child"); AS 25.24.150(c)(2) ("the capability and desire of each parent (continued...)

father.[15]  At the June 2018 hearing, the court heard from the appointed custody investigator, who testified about Noah's need for therapy and his failure to receive it while in Sidney's custody.  The investigator also testified that Sidney would not allow Noah to visit with Gingerich.  Citing the investigator's testimony, the superior court stated that Noah's relationship with his mother put him under "a pretty heavy burden for any child" that was "really, really impacting him and he does need to be in a different situation for a period of time."  At the close of this hearing, the court ordered that Sidney transfer custody of Noah that evening and ordered that her visits be supervised.  But the transfer did not happen as planned, and the parties were back before the court three days later on Gingerich's expedited motion.  The court heard disputed testimony about whether Sidney had actually dropped Noah off at the transfer site and learned that, after the exchange finally occurred, Sidney sent Noah an accusatory text asking why he had agreed to go with his father.  The court described Sidney's text messages as "damaging" and reiterated the need for supervised visitation.

In a similar vein, after admitting the custody investigator's last report into evidence and hearing testimony from the investigator and both parents, the superior court issued an interim order in December 2018 that largely adopted the investigator's recommendation for continued supervised visitation.  This recommendation rested on the investigator's findings that Sidney acted in ways harmful to Noah's best interests.  For example, while Gingerich had historically been willing to share custody with Sidney, Sidney "has not encouraged a relationship between [Gingerich] and the children, and has

---

[14]     (...continued)
to meet these needs").

[15]     *See* AS 25.24.150(c)(6) ("the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child").

actively interfered with and thwarted it for years." The report noted past evidence of Sidney's "inappropriate physical confrontations with the older children" as well as the children's reports of alcohol abuse by Sidney's boyfriend while they were around.

Then in June 2019 the court made oral findings in support of an updated interim order on which the final order of December 2019 is modeled.[16] These findings emphasized the harm to Noah of "being pulled between his parents." The superior court laid responsibility for this harm on Sidney, citing as an example her text messages interrogating Noah about his choice to go with his father at the court-ordered custody exchange the year before. The court stated the risk of emotional damage was high:

> I have had [the custody investigator] on this stand many times . . . , and I have never seen her so adamant about the possibility of damage to a child if things don't change. I can't even tell you how adamant she was about that. She was so worried about [Noah]. She was so convinced, and I believed her, . . . that if something didn't stop, [Noah] was really going to be . . . negatively impacted.

The court stated that although it tries to give parents many chances, it felt it had no choice but to restrict Sidney's visitation with Noah to avoid causing him lasting harm.

At the November 2019 hearing, the court explained its intent to "get back on track after some problems we had" — "not only not abiding by orders," but also that "the custody investigator . . . was really concerned about [Noah] and the impact of [Sidney] . . . the effect that that was having on [Noah] and just the anxiety it was

---

[16] The June 2019 order increased Sidney's visitation to unsupervised overnight visits every other weekend. It also granted her a one-week vacation with Noah over the summer. The final visitation order differed from the June 2019 order only by increasing Sidney's periods of visitation. It continued to grant Sidney unsupervised overnight visits every other weekend, with slightly longer weekend visits during summer vacation. It also granted her a two-week vacation with Noah every year and divided school vacations and holidays between the parties.

provoking in him." When Sidney's counsel argued that the limited visitation the court had imposed was "punitive," the court pointed to the "extensive testimony" from the custody investigator that Noah had not been doing well and that Sidney had encouraged him to run away. The court continued: "I had a problem with violation of orders. I had all kinds of problems. So you can call it punitive, but in my mind it was supported by the evidence." The court then noted continued instances of poor judgment by Sidney — her seeming indifference to her growing child-support arrears and her taking Noah to get a learner's permit without telling Gingerich (the custodial parent). But the court also noted that the existing visitation schedule seemed to be working for Noah and concluded it would be reasonable to modestly increase Sidney's visitation time with him.

It is clear from this explanation that the court's visitation order rests on its earlier findings about Sidney's interference in Noah's relationship with his father and the emotional damage caused by this interference. These same factors were a focus of the custody investigator's report and testimony as well as the superior court's comments at the earlier interim hearings. Relying on these factors to limit visitation is not an abuse of discretion. The court reasonably concluded that giving Sidney much more time with Noah might cause these past problems to resurface.

This review of the interim hearings and orders leading to the final visitation order also refutes Sidney's argument that the order reflects an improper desire to punish her. To be sure, a desire to punish a parent is not a permissible basis for determining custody or visitation. Although several of the statutory best-interests factors require the court to examine a parent's conduct,[17] the court must examine that conduct with an eye

---

[17]    *See, e.g.*, AS 25.24.150(c)(6) (requiring the court to consider each parent's willingness to foster a relationship between the child and the other parent); (7) (requiring the court to consider evidence of domestic violence or child abuse); (8) (requiring the
(continued...)

to whether awarding that parent custody would promote the well-being of the child —
not with an eye to whether the conduct independently merits punishment or praise.[18]
Restricting a parent's visitation for the sole purpose of punishing non-compliance with
court orders would therefore be improper. Likewise, rewarding a parent simply for
complying with court orders would also be improper, because that compliance alone
might have little relevance to the child's best interests.[19]

Yet it is not necessarily improper for a court to consider a parent's
compliance with previous custody orders when ruling upon a motion to modify custody.
For example, a parent who repeatedly refused to allow the child to visit with the other
parent in violation of the parties' custody order may have shown an unwillingness to
"facilitate and encourage a close and continuing relationship between the other parent
and the child"[20] that would be relevant to a future custody award. Likewise, a parent
who refused to take a child to court-ordered therapy may be found to lack the "capability
and desire" to meet the child's mental health needs.[21] Because custody orders are crafted
to protect the best interests of the child, a parent's violation of those orders may indicate
that the parent is undermining the child's best interests. Taking such conduct into
account is not necessarily "punishing" the parent.

---

[17] (...continued)
court to consider evidence of parental substance abuse).

[18] *See* AS 25.24.150(c) ("The court shall determine custody in accordance
with the best interests of the child . . . .").

[19] For that reason, we reject Sidney's argument that the superior court abused
its discretion in declining to reward her recent compliance by increasing her visitation.

[20] AS 25.24.150(c)(6).

[21] AS 25.24.150(c)(2).

So it is here. Although Sidney's violation of court orders played a role in the court's decision to limit visitation, the record shows the violations troubled the court because they reflected Sidney's indifference towards her children's well-being. For example, the court noted in June 2018 that Sidney had disobeyed an order that she not allow her boyfriend around Jessica. The court found this problematic not because Sidney had flouted the court's authority, but because Sidney seemed not to appreciate how her boyfriend's conduct might affect Jessica's emotional well-being. And rather than punish Sidney, the court suggested Sidney obtain a psychological evaluation to see if she has a condition that needs treatment "in order to be the best parent you can be." Similarly, the superior court curtailed Sidney's time with Noah after hearing that Sidney had prevented Gingerich from exercising his custody rights under the 2015 order. It reaffirmed those limitations in June 2019, expressing concern about Noah being "pulled between his parents" and explaining that although it liked to give parents many chances, it had no choice but to restrict Sidney's visitation to avoid causing lasting harm to Noah. The final order rested on the court's belief that Noah was doing well with this arrangement. These rulings do not reflect an improper desire to punish Sidney. Rather, they reflect a reasonable effort by the court to limit Sidney's control over Noah given her demonstrated difficulty with respecting the boundaries and facilitating the relationships he needs to be healthy.

C. **The Superior Court Did Not Abuse Its Discretion By Declining To Consider Noah's Preference.**

One factor a court must consider in determining the child's best interests is "the child's preference if the child is of sufficient age and capacity to form a preference."[22] Sidney claims that she asked the court to consider Noah's preference at

___

[22] AS 25.24.150(c)(3).

the November 2019 hearing but that the court declined to do so. She now argues that the court should have considered Noah's preference, noting that Noah was 15 years old at the time of the hearing. A court's failure to consider a statutorily mandated factor in making a custody order is an abuse of discretion.[23] But in this case the custody investigator reported that Noah lacked capacity to form a preference, and Sidney did not rebut this evidence. The superior court therefore did not abuse its discretion by declining to consider Noah's preference.

"A well-reasoned preference by a mature teenager can, in some cases, be a deciding factor" in determining custody.[24] But "in cases where a child does not show maturity or there is evidence that the choices were motivated by bad reasons, the court may choose to disregard the child's preference, or to give it little weight."[25] Here, the custody investigator's report stated that while Noah "is old enough to state a custody preference, he is not of sufficient capacity to do so." The report cited the opinion of Noah's therapist that Sidney had pressured her children to choose her over their father and had "likely coached and pressed [Noah] to say what she wants to hear, and [Noah] is well aware of her anger and outbursts when defied." The custody investigator concluded that Noah "need[ed] time and healing to fully develop the capacity to form a well-reasoned preference."

Sidney gave the superior court no reason to doubt that assessment. The investigator filed her report in September 2018, so Sidney should have been aware of the investigator's assessment of Noah's capacity. Yet she did not challenge that assessment

---

[23]     *Geldermann v. Geldermann*, 428 P.3d 477, 481 (Alaska 2018) (quoting *Riggs v. Coonradt*, 335 P.3d 1103, 1106 (Alaska 2014)).

[24]     *Schaeffer-Mathis v. Mathis*, 407 P.3d 485, 493 (Alaska 2017).

[25]     *Id.* (quoting *Michele M. v. Richard R.*, 177 P.3d 830, 838 (Alaska 2008)).

or ask the court to consider Noah's preference at the subsequent November 2018 hearing or the June 2019 hearing. Nor did she raise the issue in advance of the November 2019 hearing, mentioning it only at the close of that hearing. In doing so, she framed Noah's preference as a "change of circumstance" — a reason to revisit her request for primary (or at least 50-50) custody that the court had already denied. The superior court responded that if Sidney filed a new motion to modify custody alleging that Noah's preference was a sufficient change of circumstances, the court would consider it; absent such a motion, the court would address only visitation. Sidney's attorney did not press the issue further. The superior court did not set a "moving target," as Sidney suggests. Rather, the court addressed Noah's preference consistent with the way Sidney framed it — as a change in circumstances warranting a new custody hearing. And because Sidney framed the issue of Noah's preference this way, at the last minute, and without any evidence on hand to dispute the report that Noah's preference should not be given weight, the superior court did not abuse its discretion in declining to consider Noah's preference in deciding visitation and instructing Sidney to file another motion to modify if she wished the court to consider it.

This case is therefore unlike *Lacy v. Lacy*,[26] which Sidney cites on appeal. In *Lacy*, the superior court considered a motion to modify custody based on two children's desire to live with their father.[27] The court declined to interview the children, reasoning that counsel's representation about the children's preferences was sufficient.[28] We reversed, finding that the superior court's failure to take the children's testimony

---

[26]    553 P.2d 928 (Alaska 1976), *superseded by statute on other grounds by Deivert v. Oseira*, 628 P.2d 575 (Alaska 1981).

[27]    *Id.* at 932.

[28]    *Id.*

denied the father "the opportunity to elicit the bases for [the children's] strong preferences," which if heard might have influenced the superior court's custody ruling.[29] Here, although the court invited Sidney to file a motion to modify custody based on Noah's preference, no such motion was before the court. The court was therefore not obliged to hear additional testimony about Noah's preference before deciding visitation.

## IV. CONCLUSION

We AFFIRM the superior court's final visitation order.

---

[29] *Id.*